437 So.2d 366 (1983)
Shirley DOBARD
v.
STATE FARM INSURANCE COMPANY.
No. CA-0719.
Court of Appeal of Louisiana, Fourth Circuit.
September 13, 1983.
John B. Perry, Gertler & Gertler, New Orleans, for plaintiff-appellant.
C. Gordon Johnson, Jr., Porteous, Hainkel, Johnson & Sarpy, New Orleans, for defendant-appellee.
Before BARRY and WARD, JJ., and REMY CHIASSON, J. Pro Tem.
BARRY, Judge.
Plaintiff's action for damages against her uninsured/underinsured carrier was dismissed even though the release of "... all other persons, firms and corporations" was stricken from the written settlement.
The facts are not in dispute. Plaintiff Shirley Dobard was driving her mother to the Lafon Nursing Home after a family Christmas visit. In order to turn left off Chef Menteur Highway, Ms. Dobard stopped in the "u" turn lane because of *367 oncoming traffic and was rear-ended by a 1979 Ford driven by Mark Wiltz. The Wiltz vehicle was owned by the driver's father, Claude A. Wiltz, Sr., and was insured by Liberty Mutual Insurance Company. On September 10, 1980, plaintiff signed a written release in favor of Liberty Mutual and both Wiltzes for the $5,000.00 policy limit. The release included the standard printed verbiage "... all other persons, firms and corporations ...."
On December 28, 1981, plaintiff filed this suit against State Farm Mutual Insurance Co., her uninsured/underinsured carrier, urging the settlement failed to fully compensate her. Plaintiff presented her entire case then State Farm moved for a directed verdict. The Trial Judge reserved his ruling and State Farm presented its case which consisted of the introduction of its policy (with a $25,000 uninsured motorist limit) and the deposition of Dr. Harold Stokes. The Trial Judge then dismissed plaintiff's suit and held that deletion of "... and all other persons, firms and corporations..." did not result in an "express" reservation of plaintiff's rights against State Farm as required by LSA-C.C. Art. 2203[1]. Thus he held since the uninsured motorist carrier and the tortfeasor are co-debtors in solido, Hoefly v. Government Employees Ins. Co., 418 So.2d 575 (La.1982), the release of one co-debtor in solido without the express reservation against the other resulted in the discharge of State Farm.
Plaintiff urges the Trial Judge erred in:
1. holding that plaintiff's scratching out of "... and all other persons, firms and corporations ..." was not sufficient to reserve her rights against her own uninsured motorist carrier;
2. applying the Hoefly decision to this case; and
3. allowing the defendant to plead the affirmative defense of "extinguishment of the obligation in any manner" on the morning of trial and over plaintiff's objections in contravention of LSA-C.C.P. Art. 1005[2].

THE RELEASE
Plaintiff argues her scratching out of the phrase "... and all other persons, firms and corporations ..." negated any intent to release the other co-debtor in solido (State Farm) and was therefore sufficient to meet the codal requirement of LSA-C.C. Art. 2203. State Farm counters that the deletion was not enough because the Code and cases require a writing or some language from which an express reservation of rights can be inferred and urges that we read the release without reference to the deleted provision.
Our Supreme Court said in Cusimano v. Ferrara, 170 La. 1044, 129 So. 630 (La.1930) at 632:
There is nothing sacramental about the form in which the reservation shall be made, and, since no one is presumed to renounce a right unless it clearly appear that he intended to do so, it follows that it suffices that the intention to reserve the right against codebtors may be inferred from any expression in the release of one codebtor which negatives the intent to release the other codebtors.
* * * * * *
* * * [A] clearly expressed intention not to abandon a right is a clearly expressed intention to reserve it.
See also Honeycutt v. Town of Boyce, 341 So.2d 327 (La.1977) and cases cited at p. 331.
In Cusimano two separate releases of two co-debtors were reviewed. In one the creditor declared the release was made "with *368 full and complete reservation of all my rights against all other judgment debtors in said suit." In the other the judgment creditor authorized cancellation of a judicial mortgage only insofar as it affected the second co-debtor's property and added "in all other respects the said judgment is to remain in full force and effect." Thus, in both the remaining co-debtors were not specified, but the provisions were held adequate to meet the codal standard.
We are satisfied that plaintiff clearly intended to restrict her settlement to those specified in the release, and her intent was manifest by her deletion of the words "... and all other persons, firms and corporations...." The altered release does not provide an unconditional discharge of all co-debtors. When plaintiff lined through the catch-all phrase, she expressly limited the release to those specified, thereby making it evident she was not fully compensated by the settlement and would proceed against others.
The insurance statute mandates uninsured motorist coverage unless rejected by the insured. LSA-R.S. 22:1406. Our conclusion is in accord with the logic in the above cases and in furtherance of the avowed legislative aim evidenced by the 1974 Amendment[3] to the uninsured motorist statute: to promote (rather than defeat) full recovery by insureds who have paid premiums for this coverage.
Accordingly, we hold the Trial Judge erred in deciding the release effected a discharge of State Farm.

LIABILITY
There is no dispute as to negligence. "[W]hen a following vehicle collides with the rear of a preceding vehicle, the following vehicle is presumed to be at fault and bears the burden of exculpating himself from the inference of negligence." Hebert v. Lefty's Moving Service, 389 So.2d 855, 857 (La.App. 4th Cir.1980). No evidence was adduced to controvert Ms. Dobard's version of the accident, and defendant, in its Answer, admitted that Wiltz rear-ended the Dobard vehicle. Plaintiff testified she activated her left turn signal, stopped in the "u" turn lane and was rear-ended by the Wiltz vehicle. We are convinced the sole cause of the collision was the negligence of Mark Wiltz and Ms. Dobard was free from fault.

DAMAGES
Under the Louisiana Constitution (Art. 5 § 5) and as directed by Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975), we are to assess appropriate damages.
In 1974 Ms. Dobard fell backwards off a chair and the fall resulted in a herniated cervical disc. In March of 1977 Dr. Kenneth Vogel performed a fusion and discharged her in September, 1977 with a 10-15% permanent impairment. He felt she experienced excellent results from the surgery which left only midline neck pain without radiation and a mild limitation of motion in her neck. Ms. Dobard, her husband and daughter each testified plaintiff had completely recovered from the surgery and was only mildly limited in her activities.
This accident occurred almost three years after the fusion. Ms. Dobard testified she did not suffer immediately but a few hours later she began to feel pain up and down her spine. The next morning she was taken to Flint Goodridge Hospital Emergency Room where she saw Dr. Woods who prescribed pain medication and hot baths for a month. She returned to Dr. Vogel ten times during the two and a half years following the accident.
Dr. Vogel first saw her on February 7, 1980 (6 weeks post-accident). He had not seen her since her discharge in September, 1977 after the disc surgery. Ms. Dobard complained of cervical, bilateral shoulder, as well as right arm pain and headaches. She had mild limitation of motion in all directions, moderate left muscle spasm, moderate left brachial plexus tenderness, hypalgesia of the second, third and fourth *369 fingers of the hand, reflexes were plus two and there was a point of tenderness on the lower cervical facets bilaterally. He felt she had a probable recurrent herniated cervical disc and recommended physical therapy consisting of moist heat, massage and traction. He prescribed Darvon for pain and told Ms. Dobard to return in one month.
During February plaintiff had physical therapy 13 times. Her next visit to Dr. Vogel was on March 6, 1980. (10 weeks post-accident). Her pain had diminished but she continued to have headaches, cervical and right arm pain. Her neurological exam was unchanged but the muscle spasm was now considered mild. On April 10, 1980 the exam was basically the same and Dr. Vogel prescribed a cervical collar. On May 8, 1980 she was slightly improved but still had mild muscle spasm and pain and Dr. Vogel told her to return when needed.
Over the next two years, Ms. Dobard saw Dr. Vogel six times: August 19, 1980; October 28, 1980; November 17, 1981; May 4, 1982; June 10, 1982 and July 15, 1982. Her condition remained relatively unchanged through her discharge on July 15, 1982. She continued to have mild muscle spasm, neck pain, intermittent right hand and arm pain, mild limitation of motion, mild brachial plexus tenderness, reflexes plus two, hypalgesia of second and third fingers of the right hand. Dr. Vogel felt she had a herniated cervical disc but stated he could not be certain without a myelogram. He stated the discomfort she was having would be permanent and her disability the same as after the 1977 surgery, but her "functional impairment" more severe.
Her condition in September, 1977 was very different from in February, 1980. In 1977 she had only midline neck pain without radiation (into arms and shoulders), only mild limitation of motion in her neck, and the rest of the neurological exam was normal. By comparison, in February, 1980, she had neck pain that radiated into both shoulders and her right arm, and she had interscapular pain and headaches. The neurological exam was not normal. She had mild limitation of motion, moderate muscle spasm, moderate left brachial plexus tenderness, hypalgesia of the second, third and fourth fingers of the right hand and tenderness of the lower cervical facets bilaterally.
Ms. Dobard was also seen by Dr. Harold Stokes at the request of Liberty Mutual (Wiltz's liability insurer). Dr. Stokes, an orthopedic surgeon, examined her only once on April 9, 1980. (15 weeks post-accident). He found neither muscle spasm nor neurological abnormalities and concluded that any aggravating factors had passed and she could resume pre-accident activities.
Several witnesses testified that plaintiff could not engage in the same activities after the accident. Plaintiff's husband, Hubert Dobard, testified plaintiff was extremely upset, but prior to the accident she had participated in normal family activities. He said that two months before the accident they had moved into a new home and she assisted in the move. She used to dance, play ping pong, sew and cook. In his opinion she had recovered from the 1977 surgery. She never complained of pain until the accident. Now her activities are severely limited and she is not as "amourous" and their relationship has suffered. Before she was "so congenial with everything and so patient"now even insignificant remarks aggravate her. Plaintiff's daughter, Valli Truehill, testified that before the accident she and plaintiff visited often and they would meet for lunch downtown, take the children skating and to the zoo. She stated after the accident her mother did not participate in any activities and she did not sew or prepare food for holiday dinners. She could not do the grocery shopping or more than one or two loads of laundry. Ms. Truehill was aware plaintiff suffered headaches and neck pain and that she occasionally needed a neck brace (always when in the car). Ms. Nettie Bundy, a friend for ten years, corroborated that plaintiff was not able to participate in the same activities after the accident as before. She related the first time she saw plaintiff after the accident was at Schwegmann's *370 and stated: "I could not believe what I saw .... I saw a different Shirley.... I was really stunned ...."
Ms. Dobard testified that after the 1977 surgery she could do everything but lifting. She could sew, garden, play ping pong, piano, skate and dance. She stated that in the move to their new home she packed and unpacked everything. Just before the accident she had the whole family over for Christmas dinner and had done all her own Christmas shopping. She stated she was in good shape, felt like a normal person, and was free of pain. After the accident she lost her rosebeds because she could not keep them up. She could only sit at the piano for a half hour before feeling pain in her neck and shoulders. She stated she rarely drives, no longer makes long car trips, and must rely on her husband for grocery shopping. She stated she has pain "most of the time," particularly after over-exerting or sleeping in the wrong position. The pains are in her head, neck, shoulders and intermittently her right arm.
The observations of Dr. Vogel, the treating physician, should be accorded greater weight than those of a physician who has examined the plaintiff only once and then only for the purpose of litigation. Rodriguez v. American International Ins. Co., 394 So.2d 621 (La.App. 3d Cir.1981).
Considering this plaintiff's circumstances and her injuries, we feel she is entitled to Twenty-Five Thousand ($25,000) Dollars for past and future pain and suffering, minus $5,000 paid by Liberty Mutual,[4] plus compensable medicals of Six Hundred Fifty-Six ($656) Dollars.[5]
The judgment of the district court is reversed and judgment is now rendered in favor of plaintiff in the amount of Twenty Thousand Six Hundred Fifty-Six ($20,656.00) Dollars with legal interest from judicial demand, plus all costs including an expert fee of $200 for Dr. Vogel.
REVERSED AND RENDERED.
NOTES
[1] LSA-C.C. Art. 2203 provides in pertinent part:

The remission or conventional discharge in favor of one of the codebtors in solido, discharges all the others, unless the creditor has expressly reserved his right against the latter.
* * * * * *
[2] LSA-C.C.P. Art. 1005 provides in pertinent part:

The answer shall set forth affirmatively * * extinguishment of the obligation in any manner....
* * * * * *
[3] Act 154 of 1974 in effect made uninsured motorist coverage "excess" coverage.
[4] The uninsured carrier is entitled to an offset for any recovery from the legally responsible party. LSA-R.S. 22:1406(D)(4).
[5] The therapy bill for $450 was paid by Liberty Mutual but included $180 for the prior accident. The bill adds up to $414, minus $180, for thirteen treatments at $18 each. Dr. Vogel had two conferences with plaintiff's attorney which cannot be included, leaving a balance of $360 for office visits. X-rays cost $62.