422 So.2d 398 (1982)
Linda B. DODD
v.
NICOLON CORPORATION, et al.
No. 82-C-0790.
Supreme Court of Louisiana.
October 29, 1982.
Rehearing Denied December 17, 1982.
*399 Dennis R. Whalen, Baton Rouge, for plaintiff-applicant.
William J. Doran, Jr., William T. Kivett, Doran & Kivett, Baton Rouge, for defendant-respondent.
BLANCHE, Justice.
The plaintiff, Linda Dodd, now married to Ollie Perry, suffered an injury to her knees as a result of an accident arising out of and in the course of her employment with Nicolon Corporation, a/k/a United States Textures Sales Corporation. Plaintiff brought this suit against Nicolon Corporation and its insurer, The Maryland Casualty Company, seeking workmen's compensation benefits based on total permanent disability, or in the alternative, permanent partial disability. In addition, the plaintiff prayed for penalties and attorney's fees for the defendants' failure to pay compensation.
After a hearing on the merits, the trial court dismissed the plaintiff's suit by finding that Perry's continuing disability was attributed to her failure to engage in exercises prescribed by her doctor. The court of appeal affirmed in its original hearing. On rehearing, the appellate court again refused to grant the plaintiff any disability benefits, but did award her penalties in the amount of 12% of $1,805.00 together with $100.00 in attorney's fees. Since neither party has complained to this court concerning the court of appeal's award of penalties and attorney's fees, we uphold this portion of the judgment. We believe, however, that the lower courts erred in failing to grant the plaintiff partial permanent disability benefits.
Linda Dodd Perry was employed by Nicolon Corporation as office manager for a warehouse which stored large rolls of erosion control filter fabric. Part of Perry's job included the act of climbing on the rolls in order to cut samples for customers. On May 16, 1977, as Mrs. Perry was climbing on the rolls of fabric, she slipped and fell, striking her knees on the concrete floor.
The day following the accident, the plaintiff visited the office of Dr. James Kilroy, an orthopedic surgeon. Perry complained of pain in her left knee. After an examination of the plaintiff revealed tenderness in the area of the knee, Dr. Kilroy placed her on one crutch with a splint and an ace wrap. Three days later, Mrs. Perry returned to Dr. Kilroy's office. At this time, she was instructed to use two crutches.
On June 20, 1977, Dr. Kilroy diagnosed Perry's condition as chondromalacia of both patellas. Chondromalacia, as explained by Dr. Kilroy, is a roughness in the back of the kneecap which causes a grinding sensation, in addition to pain and swelling. After several more visits with Mrs. Perry, Dr. Kilroy determined that surgical intervention *400 was necessary to correct the condition. On April 26, 1978, surgery was performed on the plaintiff's left knee to shave the rough areas under the knee. Similar surgery was performed on the right knee on September 5, 1978.
The plaintiff commenced physical therapy on October 18, 1978. Dr. Kilroy examined the plaintiff's knees on February 9, 1979and found that she had full, unrestricted motion in her right knee. Perry was then referred to a physical therapist for a final evaluation. Upon receipt of the therapist's report, Dr. Kilroy wrote a letter on February 14, 1979 to the Maryland Casualty Company to inform it that he was of the opinion that the plaintiff could return to work as long as she did not do any excessive kneeling or climbing.
On October 29, 1979, the plaintiff complained to Dr. Kilroy that she was experiencing pain and weakness in both knees. The doctor attributed this weakness to Mrs. Perry's failure to perform her exercises, and he instructed her to continue her physical therapy. The plaintiff did undergo physical therapy for several weeks, but it was interrupted when she developed a neuroma of her left knee. This neuroma was surgically removed on January 22, 1980. Subsequently, however the plaintiff contracted phlebitis and was placed on crutches for an extended period of time. When she recovered from phlebitis, Dr. Kilroy performed a plastic closure to reduce the size of the scars on Linda Perry's legs. The plaintiff developed suture abscesses as a result of this operation.
By February 27, 1980, plaintiff was once again able to resume physical therapy. In August, 1980, however, Mrs. Perry returned to Dr. Kilroy and complained of weakness in her knees. Dr. Kilroy later testified that he believed that the plaintiff's decreased strength was a result of her failure to do her exercises. He further testified that, with proper exercise, Mrs. Perry could perform any job, as long as it did not involve excessive kneeling or squatting.

EXTENT OF DISABILITY
Plaintiff concedes in brief that she is not permanently and totally disabled. This does not, however, preclude her from receiving any compensation award at all. Schouest v. J. Ray McDermott and Co., Inc., 411 So.2d 1042 (La.1982); Allor v. Belden Corp., 393 So.2d 1233 (La.1981). La.R.S. 23:1221(3) as amended provides that an employee is deemed partially disabled if he is unable "to perform the duties in which he was customarily engaged when injured or duties of the same or similar character, nature, or description for which he was fitted by education, training, and experience..." We find that the preponderance of the evidence shows that Linda Perry is permanently and partially disabled.
The record reveals that Mrs. Perry underwent surgery on her knees on April 26, 1978 and September 5, 1978. As a result of this surgery, Dr. Kilroy awarded the plaintiff a total, permanent physical impairment rating of fifteen percent for each knee. Since these surgical procedures involved the removal of cartilage which provides a cushion for the kneecap, Dr. Kilroy told Mrs. Perry that she should refrain from any excessive kneeling.[1]
At the time of her accident, Linda Perry was employed by Nicolon Corporation as an office manager. Although her job was supervisory in nature, she was expected to perform the duty of cutting material for samples or for a sale. Mrs. Perry testified that this material was stored on large rolls and were stacked as many as twenty rolls high. In order to obtain a sample, the plaintiff would climb on the rolls, pull a roll *401 out of the stack, and stretch it out on the floor of the warehouse. Then the material would be marked, and the plaintiff would get on her hands and knees to cut it with a pair of scissors or long shears. Mrs. Perry testified that she was expected to perform these acts almost on a daily basis.
Recently, in Naquin v. Uniroyal, Inc., 405 So.2d 525 (La.1981), this court found a claimant to be partially disabled when his work-related injury prevented him from performing significant physical tasks which were expected by his employer and important to the effective performance of his work, even though the physical tasks were incidental to his supervisory position. In the present case, Mrs. Perry was expected by her employers to cut material for samples or for sales. The physical task of cutting such material required excessive kneeling, and Dr. Kilroy specifically stated that, due to her knee surgery, the plaintiff should refrain from this type of activity. Mrs. Perry, therefore, could no longer perform the significant physical tasks (that of cutting material for samples and sales) which were expected by her employer and important to the performance of her job. These tasks were employment duties in which she was customarily engaged when injured. She was therefore permanently and partially disabled on April 26, 1978, the date of her first knee surgery.
The lower courts denied disability benefits to Mrs. Perry upon finding that she had failed to engage in the exercises that Dr. Kilroy prescribed and that such exercises could have remedied any continuing functional disability. The decisions of the courts below failed to consider the uncontradicted testimony of Dr. Kilroy who stated that even if Mrs. Perry performed her exercises and regained her full strength, she should refrain from spending long periods of time kneeling or squatting.[2]

BENEFITS DUE
Since the plaintiff was injured on May 16, 1977, she is entitled to compensation benefits not to exceed 425 weeks with credit given the insurer for benefits previously paid and for those weeks in which actual wages are earned. La.R.S. 23:1221(3). The maximum weekly compensation to be paid is $95.00 per week. La.R.S. 23:1202(1).
We find that the plaintiff is entitled to receive partial permanent disability benefits commencing on April 26, 1978. It was on this date that the plaintiff underwent her first knee operation. Dr. Kilroy testified this surgical procedure involved the removal of the cushion from the kneecap and prevented Mrs. Perry from engaging in any excessive kneeling.[3]
The record reveals that after her April 26, 1978 operation, the plaintiff did receive compensation in the amount of $95.00 per week for forty-three weeks extending over the period beginning May 2, 1978 and ending February 19, 1979. Disability benefits were also paid to Mrs. Perry following her surgery for the removal of her neuroma. These benefits were in the amount of $95.00 per week and were paid for nineteen weeks, from January 22, 1980 through June 2, 1980. Credit is to be given the insurer for benefits paid during these weeks.
In addition, the record shows that Mrs. Perry was employed with Cajun Contractors and Engineers, Inc. on April 26, 1978. She then terminated her employment with Cajun on May 16, 1978 and has not worked since that time. For the three week period of April 26, 1978 through May 16, 1978, the plaintiff is only entitled to 66 2/3% of the difference between her wages at the time of her injury and any lesser wages which she actually earned with Cajun Contractors. La.R.S. 23:1221(3). At the time of her accident on May 16, 1977, Mrs. Perry was earning *402 $1,000.00 per month or $230.77 per week. With Cajun Contractors, the plaintiff earned $173.10 per week. Therefore, we find that the plaintiff is entitled to 66 2/3% of the difference of $230.77 and $173.10 which is a sum of $38.45 per week for the period of April 26, 1978 through May 16, 1978.
Although the plaintiff can seek reimbursement for medical expenses, the record indicates that the Maryland Casualty has paid all her outstanding medical bills through August 12, 1980.

DECREE
For the reasons assigned, the judgment of the Court of Appeal is reversed insofar as its failure to award the plaintiff benefits for partial disability. The decision of the Court of Appeal is affirmed as to the assessment of attorney's fees and penalties. The plaintiff is entitled to partial permanent disability benefits pursuant to the provisions of La.R.S. 23:1221(3). Such benefits shall commence April 26, 1978, and shall be received during the period of disability, not to exceed 425 weeks. Said disability benefits are subject to a credit of $95.00 per week for forty-three weeks commencing May 2, 1978 and subject to a credit of $95.00 per week for nineteen weeks commencing January 22, 1980, representing prior benefits paid. Legal interest shall accrue on all past due installments owed from date due until paid. Court costs are assessed to the defendants.
REVERSED IN PART, AFFIRMED IN PART AND RENDERED.
LEMMON, J., concurs and assigns reasons.
LEMMON, Justice, concurring in part.
I concur in the decree awarding plaintiff benefits for partial disability. However, defendant has not sought employment since her marriage. In accordance with my concurring opinion in Schouest v. J. Ray McDermott & Co., 411 So.2d 1042 (La.1982), I would allow benefits only for those weeks in which plaintiff did not earn wages because of the disability, either because the injury prevented her from working or because work was not available to a worker in plaintiff's condition with her education and skills. Accordingly, I would allow the employer an opportunity to prove that plaintiff did not work only because she chose to collect compensation instead.
NOTES
[1] On cross-examination by Mr. Whalen, Dr. Kilroy testified:

Q. And this 15% disfunction was the term you used was because you have actually had to go in and scrape cartilage from the underside of the kneecap and you have therefore reduced the amount of cartilage or the cushion that is there?
A. Yes.
Q. And it is the removal of that cushion from the kneecap that causes you to tell her she should not have excessive kneeling?
A. Yes, sir.
[2] Dr. Kilroy's testimony during direct examination by Mr. Doran:

Q. And once she had her strength back, would you have any limitations on what she could do as far as employment?
A. No, Sir. The only thing, being very sensible about it, I tell them, you shouldn'tyou did have a disease process involving your kneecaps, so I wouldn't intentionally go out and see how long I could kneel or how long I could squat. But I don't put any limitations on them.
[3] See n. 1.