449 So.2d 515 (1984)
Clarence BRIDGEWATER
v.
CROWN ZELLERBACH and its Insurer, John Doe.
No. 83 CA 0397.
Court of Appeal of Louisiana, First Circuit.
February 28, 1984.
Rehearing Denied April 3, 1984.
*516 Joseph A. Gladney, Baton Rouge, for plaintiff.
William A. Norfolk, Baton Rouge, for defendant.
Before SHORTESS, LANIER and CRAIN, JJ.
*517 LANIER, Judge.
This suit commenced as a claim for workmen's compensation benefits and medical expenses alleging that the employee was totally and permanently disabled by a job-related accident. The employee filed a supplemental and amending petition alleging that the employer acted arbitrarily, capriciously and without probable cause in denying compensation benefit payments and medical expenses and sought statutory penalties. The district court rendered judgment in favor of the employer and dismissed the employee's suit. The employee took this devolutive appeal asserting that the district court committed error by not finding that the employee's disability was caused by the job-related accident and by not finding that the employee was totally and permanently disabled or, alternatively, partially permanently disabled and entitled to workmen's compensation benefits and medical expenses.[1]

FACTS
On March 31, 1977, Clarence Bridgewater was employed by Crown Zellerbach Corporation (CZ) at its paper mill in St. Francisville, Parish of West Feliciana, Louisiana. At approximately noon on that day, Bridgewater was operating a portable forklift in the basement of the mill and was helping to lower a box of wire weighing about a ton and one-half from the machine room floor above to the basement. Bridgewater asked a fellow employee, Mike McGregor, to move a stack of paper with a front-end loader so that the wire could be lowered. In the process of moving the paper, McGregor backed the front-end loader into Bridgewater and knocked him to the floor. A short time later, Bridgewater began feeling pain in his low back area and reported the accident to his immediate supervisor, William J. Clark, a production supervisor for CZ. Clark instructed Bridgewater to report to the first aid station for treatment by Elizabeth Turnley, the plant nurse. Bridgewater told Turnley about his accident and complained of low back pain. Turnley gave Bridgewater some medication and sent him back to work. On April 4, 1977, Clark prepared an accident report on this incident.
Bridgewater continued working at the CZ paper mill but reported on a regular basis to the first aid station with complaints of low back pain. Because of these continued complaints, the plant nurse made an appointment for Bridgewater to be examined by Dr. John A. Thomas on April 18, 1977. Dr. Thomas examined Bridgewater and diagnosed his problem as a lumbosacral sprain superimposed over a preexisting thorocolumbar scoliosis. Dr. Thomas determined that there was no permanent disability or loss of physical function expected.
Bridgewater continued working but went to the first aid station on a regular basis. The plant nurse then recommended that he consult with his family physician, Dr. Louis V. Montelaro. Dr. Montelaro examined Bridgewater on May 2, 1977. Bridgewater gave a history of low back pain. Dr. Montelaro examined Bridgewater and found no neurological deficits. He diagnosed Bridgewater's condition as lumbar spasm. He recommended heat and prescribed a muscle relaxant for treatment. Dr. Montelaro subsequently issued a report to CZ on an insurance form indicating that Bridgewater was totally disabled from May 19, 1977, through May 30, 1977, because of a lumbar sprain arising from his employment.
Bridgewater continued working for CZ until November 21, 1977. On September 6, 1977, Bridgewater again saw Dr. Montelaro for a sprained wrist. He went back to Dr. Montelaro on November 21, 1977, for a very badly infected ear. The medical evidence indicates that the sprained wrist and infected ear were not related to the March 1977 accident. Dr. Montelaro treated Bridgewater for his ear on November 23 and 28, 1977.
Bridgewater testified that on December 5, 1977, he attempted to get out of bed but *518 fell down because he was unable to stand due to numbness in his legs. Bridgewater returned to Dr. Montelaro on that date. The doctor examined Bridgewater and found the ear to be clearing but that Bridgewater had a swollen left leg. This condition was diagnosed as cellulitis, an infection. Dr. Montelaro treated this condition with penicillin on December 6, 7, 8, 10 and 12. On December 13, 1977, the left leg flared up again. Dr. Montelaro continued penicillin treatments on that date and on December 14 and 17. Bridgewater returned to Dr. Montelaro on December 27, 1977. The doctor found that there was still swelling in his left leg and referred him to Dr. James E. Hand, a specialist in cardiovascular and renal diseases.
Dr. Hand examined Bridgewater on December 29, 1977, and January 17, 1978. He advised Dr. Montelaro in a report that he diagnosed Bridgewater's condition as post-phlebitic syndrome following infected tenia pedis of the left foot and Raynaud's syndrome. At the last visit, Dr. Hand found that Bridgewater had improved considerably, the edema was gone from the dorsum of the left foot leaving a brownish discoloration over his venous pattern, and the athletes foot between his toes was better but still present. Dr. Hand advised Bridgewater to continue treatment of the athletes foot, take medication and advised him not to work until he was able to stand without pain. Bridgewater saw Dr. Montelaro again on January 19, 1978, and February 11, 1978. At the February visit, he complained of pain in his left leg and foot and swelling of the hands. From September 1977 through February 11, 1978, the records of Dr. Montelaro and the report of Dr. Hand do not reflect that Bridgewater complained about pain in his back. Bridgewater was paid nonoccupational disability benefits of $130 per week for 11 weeks and 2 days ($1,467.14) for the period of November 23, 1977, to February 9, 1978.
On February 22, 1978, Bridgewater consulted Dr. Samuel C. Irwin on a referral from Dr. Hand. Bridgewater gave a history of numbness in the left leg extending from mid thigh to the mid leg region and chronic low back pain. He told Dr. Irwin that he hurt his back in the service in 1972 when he fell down and reinjured his back at work in 1977. Dr. Irwin took X-rays of Bridgewater's lumbar spine and left leg and gave him a clinical examination. He found no spasm or muscle group weakness in either leg. Bridgewater had normal motion and the reflexes in his knees and ankles were intact and symmetrical. The circulation was intact in both legs and there was no evidence of soft tissue swelling. Dr. Irwin found no objective evidence of back problems or left lower extremity pathology. He diagnosed Bridgewater's condition as a low back pain syndrome. Dr. Irwin issued a report to CZ dated March 20, 1978, wherein he stated that "[i]t is my opinion that this leg pain could indeed be caused by his back problem." Dr. Irwin recommended in this report that Bridgewater engage in light duty until he was recovered. Dr. Irwin saw Bridgewater again on March 23, 1978. Bridgewater complained of continued back pain and pain in his legs. Dr. Irwin referred Bridgewater to Dr. Samuel L. Levert, Jr., a neurologist, for further examination. This suit was filed on March 31, 1978.
Bridgewater was examined by Dr. Levert on April 11, 1978. Dr. Levert's neurological examination was within normal limits. He found no swelling of the left leg and no objective evidence of spinal cord, nerve root or peripheral nerve pathology.
Bridgewater returned to Dr. Irwin on May 12, 1978, complaining of continued back and leg pain with numbness in the legs. Dr. Irwin found no objective evidence of pathology but recommended a conservative program to decrease stress on the back. No medication was prescribed at this time. On May 26, 1978, Dr. Irwin furnished the following report to CZ:
This patient returned for re-evaluation and was seen on May 12, 1978. He continues to complain of back and leg pain, numbness, and inability to work. His symptoms are essentially the same as on his last visit.

*519 Physical examination today fails to reveal any objective signs of pathology. In view of this man's subjective complaints and lack of objective findings, both by me and by Dr. Levert, I feel that this man can return to work with no limitations. He is to return here prn symptoms.
On August 29, 1978, Bridgewater returned to Dr. Montelaro for a disability evaluation for welfare. He gave a history of chronic low back pain with radiation into both legs. Dr. Montelaro's examination at that time was neurologically negative. Bridgewater saw Dr. Montelaro again on August 9, 1979, for gastritis.
On February 4 and 20, 1980, Bridgewater went to the Veterans Administration (VA) Hospital complaining of pain in his low back which radiated into both legs. Bridgewater was admitted to the VA Hospital on March 13, 1980, and underwent diagnostic testing until his release on March 25, 1980. The hospital was unable to determine the cause of Bridgewater's complaints. A report on these examinations rendered by Dr. Edgar N. Weaver observed in pertinent part as follows:
He did have tight paraspinus muscles bilaterally. Neurologically, he was completely intact without any evidence of a radiculopathy. The patient was scheduled for a myelogram which was totally within normal limits. The patient was also scheduled for an EMG. This likewise was normal. The patient had psychological testing ordered, but this could not be done because of the patient's illiteracy. It should be noted that the tester, a psychologist, felt that we were `dealing with an immature, hysteroid personality structure for which his present litigation may well be a prime motivating factor.'
. . . . .
There is absolutely no evidence on examination or variety of neurological studies that this patient has any significant neurologic disease. The only positive findings in a thorough workup are a very slight `lumbar scoliosis' and a failure of S1 neural arch to close. As mentioned, neither of these in my opinion is of any significance. The patient will not be asked to return to the clinic. He will be given a prescription for Tylenol No. 3, Dalmane 30 mgs. The patient, in my opinion, has no reason to be disqualified from any type of work.
On May 19, 1981, Bridgewater was examined by Dr. Kenneth E. Vogel, a neurologic surgeon. He gave a history of low back and bilateral leg pain. Dr. Vogel's examination revealed a mild degree of limitation of motion with flexion and tenderness to the L5 facets to palpation bilaterally. The rest of the examination was normal. Apparently, Dr. Vogel referred Bridgewater back to the VA Hospital for an electromyography (EMG) study. The records of the VA Hospital show that the request for the EMG was made on June 8 or 10, 1981. On June 26, 1981, Dr. P.K. Sarala conducted the EMG and rendered the following report:
EMG of the above mentioned muscles showed increased insertional activity in the left L5, S1 paraspinal muscles and positive sharp waves in S1 area.
IMPRESSION: Findings compatible with a left S1 radiculopathy.
On July 13, 1981, Bridgewater returned to Dr. Montelaro complaining of low back pain. He also told Dr. Montelaro that he was being seen by Dr. Vogel. Dr. Montelaro gave him a prescription for pain medication. On July 20, 1981, Bridgewater stopped by Dr. Irwin's office to discuss his case but was not examined.
On July 23, 1981, Bridgewater returned to Dr. Vogel still complaining of low back pain with radiation to both legs but with greater pain in the left leg. At this time, Dr. Vogel diagnosed Bridgewater's condition as a herniated lumbar disc or a lumbar facet syndrome (arthropothy).
On August 30, 1981, Bridgewater was admitted to the Mercy Hospital for additional diagnostic testing and possible surgery. On August 31, 1981, Dr. Abner M. Landry, a specialist in radiology, X-rayed Bridgewater and performed a myelogram *520 upon him. The X-rays were normal. The myelogram showed minor ventral indentations at the L4-5 and L5-S1 levels of the spinal column. There were no lateralizing defects or other significant positive findings. Dr. Landry testified that, although this study was essentially normal, it did indicate a bulging disc.
On September 1, 1981, Dr. Landry performed a lumbar discogram on Bridgewater. At the L3-4 level, he found internal disintegration of the disc, but no herniation or rupture. At the L4-5 level, he found internal disintegration of the disc and herniation of the disc material to the left. At the L5-S1 level, he found internal disintegration of the disc with no evidence of herniation. On September 2, 1981, Dr. Vogel performed a lumbar laminectomy with excision of a herniated disc at the L4-5 level and a lumbar facet rhizotomy (cutting of nerves that carry pain from facets to main sensory nerve) of the L3-5 levels. Bridgewater was discharged from the hospital on September 10, 1981.
Bridgewater saw Dr. Vogel again on December 10, 1981. Dr. Vogel was of the opinion that Bridgewater had a 10-15% medical impairment of the body as a whole as a result of his operation. He felt that Bridgewater could not do heavy manual labor and should avoid activities requiring lifting, pushing or pulling more than 50 pounds or activities involving repeated bending. Bridgewater could do light work when he was six months post-operative (March 1982) and would reach maximum recovery when he was one year post-operative (September 1982). Dr. Vogel gave the following testimony concerning the cause of Bridgewater's herniated disc:
This patient has a herniated disk, we know. The etiology of that herniated disk is based, primarily, on his history. If this patient, indeed, had an injury in March of 1977 and if his pain did not resolve with treatment by any of the doctors, including those we've previously discussed, from 1977 through 1980 until I saw him, then in all medical probability, the injury of March of 1977 is the etiologic cause for his herniated disk and for the operative procedure which I carried out.
. . . . .
The Rule of Thumb that we use is that if a patient has an injury and if that injury results in pain, if the pain resolves and your patient then has a period of at least three months where he is asymptomatic then has recurrent pain, then we look for a second cause for the recurrent pain. However, if the patient has unrelenting pain which doesn't resolve for at least a three-month period, then we go back to the original injury; and we consider that to be the etiologic cause.
If I understand the patient's history correct, from what he told me, between March of 1977 and when I saw him, there was no prolonged length of time during which he was asymptomatic or free of pain; and there's no other injury that he related to me which caused an exacerbation of his injury. Therefore, in all medical probability, the March of 1977 injury is the etiologic cause of his herniated disk.[[2]]
Bridgewater also presented lay testimony concerning his medical condition. He testified that he had constant low back pain that increased with exertion after the March 1977 accident. Joseph N. Bernard, a pharmacist, testified that during the period of August 1977 through February of 1978 he issued various prescriptions to Bridgewater. At unspecified times during this period, Bridgewater complained to him about pain in his low back and legs. Bridgewater's wife, Jocelyn, testified that Bridgewater constantly complained about *521 his back since the March 1977 accident. She also testified that Bridgewater could no longer do yard work, housework or repairs to their house. Two friends of the family, Lloyd Albert, Jr. and Mark A. Rodney, testified that since the March 1977 accident Bridgewater could no longer play softball or do repairs around the house. After Rodney testified, the parties stipulated that there were additional lay witnesses who would testify essentially the same as Albert and Rodney.
The chain of causation required by La.R.S. 23:1031 is that the employment causes the accident, the accident causes injury, and the injury causes disability. The plaintiff-employee in a workmen's compensation accident has the burden of establishing by a preponderance of the evidence the causal connection between his disability and the accident. Martin v. H.B. Zachry Company, 424 So.2d 1002 (La.1982). The factual findings of the district court as to work-related disability are entitled to great weight on appellate review. Crump v. Hartford Accident and Indemnity Company, 367 So.2d 300 (La.1979).
The evidence is uncontroverted that on March 31, 1977, Bridgewater was struck by a front-end loader and knocked down; in 1981, over four years after this accident, Bridgewater was found to have a ruptured disc at the L4-5 level of his spinal column; and the operation performed on Bridgewater in September of 1981 to correct the ruptured disc resulted in a permanent disability (total or partial). The district court (without assigning reasons for judgment)[3] apparently determined as a fact that there was no causal relation between the accident of March 1977 and the herniated disc discovered in 1981. To reach this result, the court must have rejected the lay testimony regarding Bridgewater's medical condition and the testimony of Dr. Vogel.
Bridgewater testified that he had constant low back pain after his accident with the front-end loader and that his condition got worse and led to his inability to work. This testimony was corroborated by Bridgewater's wife who also testified that his ability to do chores around the house was substantially reduced. Two of Bridgewater's friends confirmed that after the accident he could no longer engage in sports or work around the house as he did before the accident. The parties stipulated that additional lay witnesses were available to corroborate the testimony of the two friends. Significantly, the pharmacist, Joseph N. Bernard, whom the record does not reveal as either a friend or relative of Bridgewater, testified that during the period from August 1977 through February of 1978 Bridgewater complained to him about pain in his low back and legs at unspecified times. Bridgewater complained of pain in his back immediately after the accident; when he saw Dr. Thomas in April of 1977; when he saw Dr. Montelaro in May of 1977; when he saw Dr. Irwin during February to May of 1978; when he saw Dr. Montelaro in August of 1978; when he went to the VA Hospital in February and March of 1980 and when he saw Dr. Vogel in May through September of 1981. The fact that the records of Dr. Montelaro and Dr. Hand do not reflect that Bridgewater complained of back pain during the visits in September of 1977 through February of 1978 is not controlling because he had more pressing medical problems holding his attention. These medical histories given to the medical experts corroborate the lay testimony concerning Bridgewater's continuous back pain. There is no direct evidence in the record that Bridgewater did not have continuous back pain. If the district court rejected the lay testimony and determined as a fact that Bridgewater was not continuously suffering low back pain after the accident of March 1977, such factual conclusion is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
*522 Once it is accepted as a fact that Bridgewater suffered constant and continuous back pain after the accident, then we must examine the expert medical evidence to determine the source of the pain. In April of 1977, Dr. Thomas determined that the March 1977 accident caused a lumbosacral sprain superimposed over a preexisting thorocolumbar scoliosis. In May of 1977, Dr. Montelaro determined that the accident caused a lumbar spasm or lumbar sprain that disabled Bridgewater from May 19, 1977, through May 30, 1977. In February of 1978, Dr. Irwin diagnosed Bridgewater's condition as a low back pain syndrome. He issued a report to CZ in March of 1978 and indicated that Bridgewater's leg pain could indeed be caused by his back problem. Drs. Thomas, Montelaro, Irwin and Levert only utilized clinical examinations and did not use an EMG, myelogram or discogram. These examinations ultimately failed to reveal the cause of Bridgewater's complaints.
The EMG and myelogram performed on Bridgewater in March of 1980 at the VA Hospital were normal. However, Dr. Abner Landry testified that myelograms are accurate in only 75% of the cases. (Compare Martin v. H.B. Zachry Company, 424 So.2d at 1005). Dr. Landry further testified that the myelogram that he performed in August of 1981 was essentially normal, although it did indicate a bulging disc. Although the EMG done by the VA Hospital in March of 1980 was normal, the EMG performed by that same hospital in June of 1981 indicated "a left S1 radiculopathy." The record does not show that Bridgewater suffered a trauma between those two dates.
The diagnosis of a ruptured disc was not confirmed until Dr. Landry performed the discogram on September 1, 1981. Subsequent surgery verified the existence of the ruptured disc. A reasonable evaluation of the evidence shows that Bridgewater's employment caused the accident of March of 1977, the accident caused an injury to his back which manifested itself as a ruptured disc causing disability and the surgery necessary to treat this injury has resulted in a permanent disability. The judgment of the trial court determining otherwise is contrary to the evidence and is reversed.

DISABILITY
A workmen's compensation claimant is totally and permanently disabled if he is unable to engage in any gainful employment. La.R.S. 23:1221(2). Louisiana has also adopted the "odd-lot" doctrine which provides that a claimant is also totally and permanently disabled if he can establish that because of his physical impairment and other factors, such as mental capacity, education, and training, he can perform no services other than those which are so limited in quality or dependability that a reasonably stable market for them does not exist. Oster v. Wetzel Printing, Inc., 390 So.2d 1318 (La.1980). A claimant who is able to engage in some employment, though not necessarily the type of employment he was engaged in at the time of the accident, is considered to be only partially disabled. La.R.S. 23:1221(3); Dodd v. Nicolon Corporation, 422 So.2d 398 (La. 1982); Stracener v. United States Fidelity & Guaranty Company, 420 So.2d 1101 (La.1982). The claimant in a workmen's compensation proceeding bears the burden of proving to a legal certainty and by a reasonable preponderance of the evidence the nature and extent of his disability. The issue of whether or not he has carried this burden must be determined by examining the totality of the evidence, including both lay and medical testimony. Daney v. Argonaut Insurance Company, 421 So.2d 331 (La.App. 1st Cir.1982).
A report by Dr. Montelaro shows that Bridgewater was temporarily totally disabled from May 19, 1977, through May 30, 1977. However, the employment records of CZ were not filed in evidence and we are unable to tell if he was paid wages in lieu of compensation during this period. Except for this period, Bridgewater was not disabled from March 31, 1977, to November 21, 1977, because he continued to work for CZ. On November 21, 1977, Bridgewater *523 stopped working for CZ because of a very badly infected ear, a nonwork-related condition. Bridgewater was treated successively for an ear infection and a leg infection between February 21, 1977, and February 11, 1978. He was paid nonoccupational disability benefits for the period of November 23, 1977, to February 9, 1978. He did not return to work or attempt to return to work after he was released from treatment for the infections. The record does not have sufficient medical evidence to show when the injury incurred by Bridgewater in March of 1977 manifested itself as disabling. The record does not have sufficient medical evidence to show the extent of Bridgewater's disability (total or partial) from November 21, 1977, to September of 1981.
The testimony of Dr. Vogel shows that Bridgewater was totally but temporarily disabled as a result of the operation for a six-month period from September 2, 1981, to March 2, 1982. After March 2, 1982, Bridgewater was capable of doing light work which did not involve lifting, pushing or pulling more than 50 pounds or activities involving repeated bending. When Bridgewater reached maximum recovery in September of 1982, he had a permanent partial disability of 10-15% of the body as a whole. Bridgewater is a high school graduate with 480-500 hours of welding experience. He also has training as an X-ray technician and a physical therapist. While in the service, he was a combat engineer. He was born on August 25, 1952, and is married with two children.
Bridgewater did not present evidence to show that because of his physical impairment, mental capacity, education or training he could perform no services other than those which were so limited in quality or dependability that a reasonably stable market for them did not exist. Therefore, he has failed to prove that he is totally and permanently disabled as an "odd-lot" employee. The testimony of Dr. Vogel clearly shows that Bridgewater has been able to engage in some employment since March 2, 1982. Bridgewater has thus established that he is permanently but partially disabled as a result of his injury.
Although Bridgewater has established the nature and extent of his disability after the operation, the evidence fails to establish the nature and extent of the disability during the period from the accident to the operation. We are most reluctant to remand a matter to a trial court to take additional evidence because this further delays a final decision of the case. Shatoska v. International Grain Transfer, Inc., 430 So.2d 1255 (La.App. 1st Cir.1983). However, because of the facts and circumstances of the instant case, we believe that the interest of justice requires a remand to specifically determine the nature and extent of Bridgewater's disability during the period of November 21, 1977, to September 2, 1981.

BENEFITS DUE
The parties stipulated at the trial that if Bridgewater was entitled to workmen's compensation benefits he was entitled to the maximum authorized at the time of his accident. For injuries occurring on or after September 1, 1976, and on or before August 31, 1977, the maximum weekly compensation benefits authorized were $95 per week. La.R.S. 23:1202(1).
On the remand, Bridgewater would be entitled to benefits for temporary total disability of $95 per week for the periods of May 19, 1977, through May 30, 1977, and September 2, 1981, through March 2, 1982. La.R.S. 23:1221(1).
In March of 1977, for partial permanent disability, an employee was entitled to sixty-six and two-thirds percent of the difference between the wages he was earning at the time of the injury and any lesser wages which he actually earned in any week thereafter in any gainful occupation for wages not beyond a maximum of 425 weeks. La.R.S. 23:1221(3). Although Bridgewater has established entitlement to benefits for partial permanent disability after March 2, 1982, the record does not reflect if, or when, he would be entitled to *524 such benefits prior to September 2, 1981. This determination shall be made by the trial court on the remand and the final judgment shaped accordingly.

MEDICAL EXPENSES
An employer is required to pay for all necessary medical, surgical, hospital and medicine expenses for an injured employee. La.R.S. 23:1203; Oregon v. Tri-State Road Boring, Inc., 434 So.2d 65 (La.1983).
Bridgewater proved entitlement to the following medical expenses:

1. Dr. Montelaro $ 8.00[4]
2. Dr. Irwin 120.00
3. VA Hospital 2,172.00
4. Mercy Hospital 4,773.07
5. Tens Unit from Lambert's 629.59
6. Dr. Vogel 2,695.00
 __________
 TOTAL $10,397.66

Bridgewater is entitled to an award of $10,397.66 with legal interest on each individual expense from the date the expense was incurred until it is paid. La.C.C. arts. 1938 and 2924.

SPECIAL COSTS
Bridgewater is entitled to recover expert witness fees for Drs. Irwin, Vogel[5] and Landry of $150 each, and $75 for Dr. Montelaro. La.R.S. 13:3666(A), (B). Bridgewater is entitled to recover $42 for the cost of the Mercy Hospital records. La.R.S. 13:3666(C). Bridgewater has proven and is entitled to recover deposition costs of $318.15. La.R.S. 13:4533; Sorapuru v. Simon, 380 So.2d 1225 (La.App. 4th Cir.1980).

DECREE
For the foregoing reasons, the judgment of the district court is reversed. Judgment is rendered in favor of Bridgewater and against CZ finding that the work-related accident of March 31, 1977, caused Bridgewater's disability. Judgment is further rendered in favor of Bridgewater and against CZ for medical bills and expenses totaling $10,397.66 with legal interest thereon from the date that each of the expenses were incurred until paid. CZ is assessed expert witness fees of $150 each for Drs. Landry, Vogel and Irwin and $75 for Dr. Montelaro. CZ is assessed $42 for the cost of the Mercy Hospital records and $318.15 for the costs of depositions used at the trial. CZ is cast for all costs in the trial court and in this court. It is ordered that this cause be remanded to the district court for the purpose of determining the nature and extent of the employee's disability during the period of November 21, 1977, to September 2, 1981, and to render an appropriate judgment reflecting all benefits due the employee for disability in accordance with the views expressed herein.[6]
REVERSED AND RENDERED IN PART AND REMANDED IN PART.
NOTES
[1] The employee does not assign as error the denial of his claim for statutory penalties.
[2] The testimony of the medical doctors was presented by either deposition or stipulating their reports. This court is not bound by the manifest error rule in evaluating this evidence. F & S Offshore, Inc. v. Service Machine & Shipbuilding Corporation, 430 So.2d 1167 (La.App. 1st Cir.1983); Schwarz v. Bourgeois, 422 So.2d 1176 (La.App. 4th Cir.1982), writ denied, 429 So.2d 153 (La.1983); Farris v. Ducote, 293 So.2d 589 (La.App. 3rd Cir.1974), writ refused, 295 So.2d 814 (La.1974).
[3] The court minutes for October 20, 1982, indicate that oral reasons for judgment were assigned that date. The judgment signed and filed on November 2, 1982, indicates that oral reasons for judgment were assigned. The record contains no transcript of oral reasons for judgment.
[4] A bill from Dr. Montelaro for $65 was filed in evidence, but only an $8 charge on this bill is related to Bridgewater's back.
[5] Dr. Vogel requested a fee of $250, but we find that he is entitled only to the same award as Drs. Landry and Irwin.
[6] The employee is entitled to legal interest on each weekly compensation benefit from its date due until paid. Shatoska, 430 So.2d at 1263.