LANIER, Judge.
This action is a suit for workers’ compensation benefits, medical expenses and statutory penalties. The trial court rendered judgment in favor of the employee and against his employer and the employer’s insurer for six weeks of temporary total compensation benefits of $95.67 per week commencing June 27, 1986 (total amount $574.02), $301 in medical expenses, legal interest and all costs. The claim for statutory penalties was denied. The employee took this devolutive appeal.
FACTS
On June 27, 1986, Jimmie R. Breshears was employed by Security Guard Service, Inc. (Security) as a security guard at the Placid Oil Company refinery in Port Allen, Louisiana. The Hartford Insurance Company of the Southeast (Hartford) was the workers’ compensation insurer of Security.
Breshears testified that he went to work at 7:00 p.m. on June 27, 1986, a Friday. At 7:30 p.m., Breshears closed a warehouse gate on the premises. The gate was made of heavy pipe, was about twenty feet long, and rolled on two inflatable rubber tires. Breshears testified he pulled the gate until it was about fourteen to sixteen inches from the gatepost and then he jerked it until it reached the post and he could chain it. While he was jerking and lifting the gate toward the post, he felt a “pop” in his neck and had a burning sensation go down his neck and into his shoulder and left arm. Although Breshears recorded closing the gate in his Officer’s Daily Activity Report, he did not report the injury in it. The pain, however, was not so great as to keep him from completing his shift at 7:00 a.m. on June 28. Breshears did not report the injury to his relief or anyone on the jobsite.
Breshears went home, told his wife about what happened, and attempted to telephone his supervisor at Security, Joyce Forrest, and the Area Manager for Security, William B. “Brad” Bryan, but was unable to reach them. Breshears’ wife, Doris, also unsuccessfully attempted to telephone Forrest and Bryan while Breshears was asleep. Bryan and Forrest testified at the trial that they were available by telephone on that weekend. On Saturday, June 28, 1986, Breshears’ pain was much greater, but he worked his twelve-hour shift.
On Sunday, June 29, 1986, the pain was “unbearable”, and Breshears telephoned Forrest, told her about the accident, and said he could not work. Breshears testified at the trial that Forrest told him Bryan was out of town. Bryan testified he was not out of town. Forrest called Bryan and advised him of Breshears’ call. Bryan instructed Forrest to advise Breshears to go to a doctor and send Security the bill. Forrest then called Allen J. Lockwood, Security’s site supervisor at the Placid plant, and advised him of Breshears’ call. Lockwood said he would cover for Breshears. Forrest then called Breshears back and advised him of what Bryan said.
On Monday, June 30, 1986, Breshears went to Dr. Andrew T. Kucharchuk, an orthopedic surgeon. Breshears gave a history of lifting a heavy gate and feeling something “pop” in his neck and shoulder. Breshears complained of pain in his neck and left shoulder and said he had no other medical problems. Dr. Kucharchuk’s examination of Breshears’ shoulder was “remarkably unremarkable.” Inspection of *732 the spine revealed marked paraspinal muscle spasm. Palpation revealed pain at the C-7 vertebra level. Dr. Kucharchuk’s tentative diagnosis was a degenerative disc at the C-5/G-6 level. He recommended conservative treatment and a CAT scan of Breshears’ neck. Dr. Kucharchuk was of the opinion that Breshears could not return to work. Breshears was given medication and commenced physical therapy.
A CAT scan was done on Breshears on July 1, 1986, but it was unsatisfactory. Breshears had a routine office visit with Dr. Kucharchuk on July 16, 1986. A second CAT scan was performed on July 18, 1986. Dr. Charles S. Greeson, a radiologist, interpreted this CAT scan as follows:
At C3-4, disc material protrudes in an angular manner in the central portion of the canal, and effaces the thecal sac to a slight degree.
At C4-5, right paracentral disc herniation is shown with effacement of the thecal sac. Mild bilateral foraminal stenosis is present at that level.
At C5-6, marked posterior bar formation is shown with marked bilateral foraminal stenosis present.
At C6-7, similar changes to those shown at C5-6 are evident. A prominent posterior bar and marked bilateral foraminal stenosis is shown.
Sagittal reconstructions show narrowing of the AP dimension of the canal to a rather marked degree at all levels examined, with the AP dimension varying from .6 to .8 cm.
IMPRESSION: 1. Central disc herniation at C3-4.
2. Right paracentral disc herniation at C4-5.
Mild foraminal stenosis is also present at this level.
3. Prominent posterior bar formation and severe bilateral foraminal stenosis at C5-6 and at C6-7.
4. Marked compromise of the AP dimension of the canal at all levels examined.
By letter dated July 15, 1986, Breshears’ attorney made demand on Security for compensation benefits. On July 18, 1986, Breshears met with Bryan, and Bryan filled out an accident report for the Workers’ Compensation Administration (WCA). On that same date, Security sent a copy of this report to Hartford and advised it as follows:
It is our opinion that this alleged injury was not the result of a job-related accident. Mr. Breshears claims that he was injured as he lifted a rolling gate to close it. The gate does not require lifting, and rolls quite easily. Mr. Breshears did not report the incident to his work companion or his supervisor, nor did he log it on any of his reports. In fact, it was two days later when one of my office supervisors was notified by Mr. Breshears of the injury. Mr. Breshears has demonstrated prior to this incident the posture of a man with a neck problem. Not only myself, but his fellow employees have noticed the stiffness in his neck in the way he turns his head.
At the trial, Breshears testified one of the tires on the gate was flat and the other was almost flat. Lockwood testified he checked the tires after the incident, the tires had 40 psi instead of 50 psi, but, while they were a little low, this condition did not cause any problems in moving the gate. Lockwood filled them to 50 psi with a small foot pump.
On August 18, 1986, Breshears had his last routine visit with Dr. Kucharchuk. Dr. Kucharchuk felt Breshears needed more diagnostic testing and had a 50% chance of needing surgery to his neck. Breshears’ shoulder problem was “unremarkable” and improved. Breshears stopped seeing Dr. Kucharchuk because he was unable to pay for his services.
On August 15, 1986, Breshears filed a claim for compensation with the WCA. By letter dated September 15, 1986, the WCA ruled the claim was not work related and Breshears was not entitled to benefits. This suit was filed on October 10, 1986.
*733 CAUSAL NEXUS BETWEEN ACCIDENT AND NECK INJURY[1]
(Assignments of Error Numbers 1, 2 and 3)
The trial court found as fact that Breshears had a work-related shoulder injury which had a six-week duration and that there was insufficient evidence to show a causal link between the accident and the neck injury. Breshears contends the trial court erred in concluding his neck injury was not caused by the accident.
The expert medical evidence in this case consists of the deposition of Dr. Kuchar-chuk and the report of Dr. Greeson. Breshears asserts in brief that we are not bound by the manifest error—clearly wrong standard for appellate review of fact in reviewing this evidence. This assertion is wrong. Virgil v. American Guarantee and Liability Insurance Company, 507 So.2d 825 (La.1987).
The law applicable to these assignments of error is set forth in Walton v. Normandy Village Homes Association, Inc., 475 So.2d 320, 324-325 (La.1985) as follows:
As in other civil suits the employee in a worker compensation proceeding initially has the burden of establishing his disability and its causal relation with the employment accident by a preponderance of the evidence_ In order for the employee to recover, it must be determined that the employment somehow caused or contributed to the disability, but it is not necessary that the exact cause be found_ A claimant’s disability is presumed to have resulted from an accident, however, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves af-terwards, providing either that there is sufficient medical evidence to show there to be a reasonable possibility of causal connection between the accident and the disabling condition, ... or that the nature of the accident, when combined with the other facts of the case, raises a natural inference through human experience of such a causal connection....
Preexisting disease or infirmity of the employee does not disqualify a claim if the work-injury aggravated, accelerated, or combined with the disease or infirmity to produce death or disability for which compensation is claimed_ Correla-tively, when an employee proves that before the accident he had not manifested disabling symptoms, but that commencing with the accident the disabling symptoms appeared and manifested themselves thereafter, and that there is either medical or circumstantial evidence indicating a reasonable possibility of causal connection between the accident and the activation of the disabling condition, the employee’s work injury is presumed to have aggravated, accelerated or combined with his preexisting disease or infirmity to produce his disability....
Once the disabled employee establishes the presumption of a causal relationship, the party denying the existence of the presumed fact assumes both the burden of producing evidence and the burden of persuasion on the issue.... In other words, in order for the party denying the existence of the presumed causal relationship to prevail on the issue, he must produce evidence and persuade the trier of fact that it is more probable than not that the work-injury did not accelerate, aggravate or combine with the preexisting disease or infirmity to produce his disability. [Citations omitted.]
See also Scott v. Acadian Concrete Co., Inc., 516 So.2d 446 (La.App. 1st Cir.1987), writ denied, 520 So.2d 751 (La.1988).
*734 Dr. Kucharchuk gave the following pertinent testimony:
A. ... I do feel at this point, though, that obviously the patient had some predisposing problems in his neck, especially in the lower levels of his neck, in which he had foraminal stenosis, the degenerative disc, which is, again, consistent with longstanding injuries. However, at C-3, C-4 and C-4, C-5 he had what appeared to be a fairly acute ruptured disc, which is an acute injury.... So I feel that probably his main problem is confined to his neck, and he does have evidence of both fairly acute and fairly chronic pathology of his neck.
Q. When you say “acute,” Doctor, does that mean a traumatic injury or—
A. Well, let’s put it this way. The thing is, though, for a ruptured disc to appear like this in an old man and it’s not decalcified, it has to be less than six months old. So obviously all the changes are in the lower neck. I can show you_ But anyway, if you take a look here, you see the degeneration of the disc. This is obviously a chronic change. If you take a look at these levels, the discs appear not to be calcified, and on this initial x-ray appear to be free of injury; however, his ruptured disc appeared at this level, C-3, C-4, and then C-4, C-5. And basically, again, they appear to be not chronic injuries. What that means is it’s probably—what happens is that these people have chronic changes in their neck, and it will take them—if they don’t get operated on and what have you, they will probably calcify, degenerate, scar down, and you have a condition like the condition at C-5 and C-6. But at C-4 and C-5, he had what appeared to be a fairly acute injury. By acute, I mean less than six months old. Now, if you take another CAT today, which is six months later, you might see that all of these discs are calcified.
Q. Just for clarification in referring to your report of August 26, do you feel that the acute herniation is at C-3, C-4,—
A. And C-4, C-5.
Q. —and C-4, C-5?
A. Right.
Q. But you also feel there’s herniation at C-6, C-7, but that’s a chronic thing?
A. That’s a chronic thing. Okay. Let’s review the CAT scan results. Okay. Here’s what the man said. There is obviously acute—fairly acute changes at C-3, C-4 and C-4, C-5. At C-5, C-6 and C-6, C-7 there is posterior bar formation and forami-nal stenosis. So basically he had what they call a hard disc, a disc that’s already calcified, a disc with a lot of calcification at that level. Obviously that’s not an acute injury. But the ones at C-3, C-4 and C-4, C-5 look like they’re of fairly recent origin. Whether it was three days or three months, it’s still something that is not all that chronic.
Q. Also, Doctor, just for clarification, in the history that he gave you, he stated that he was lifting a heavy gate. That was at the Port Allen refinery when he related it to you?
A. Yes, sir. And he stated he was well and asymptomatic until that time, and the only problem that he mentioned, he had had problems with a fractured jaw.
[[Image here]]
Q. The chronic type of changes that you saw with this gentleman, could that explain—suppose that there was evidence in this case that this gentleman had a stiff neck and had difficulty moving, and would move his whole body instead of being able to move his neck from side to side normally. Could the chronic problems that you found explain that?
A. Yes, sir. Yes, sir. You see, the thing is, though, basically if C-7 and C-6 and C-5, if they all get stiff, the other segments of the spine have to become hypermobile, so basically *735 they take more stress than the lower parts. So he could have some big problems with that.
Q. Is it possible that in the absence of this alleged accident that he says he had, that he could have had this condition that you saw in C-3, C-4 and C-4, C-5, even without that accident?
[[Image here]]
A. Well, you have to have something happen. All I’m saying is that the injury he had at C-3, C-4 and C-4, C-5 was of a much more recent nature than we had at the other part. And, again, it could be consistent with the history he did give. Whether or not this happened four months ago or five months ago, you really don’t know. You have to go by the patient’s history.
In summary, Dr. Kucharchuk found (1) Breshears has a chronic (preexisting) degenerative disc condition at the C-5/C-6 and C-6/C-7 levels of his cervical spine; (2) this condition caused other portions of the spine to become hypermobile and take more stress; (3) the herniated discs at the C-3/C-4 and C-4/C-5 levels were acute and occurred within six months preceding his examination; and (4) the herniated discs at the C-3/C-4 and C-4/C-5 levels were consistent with the medical history given to Dr. Kucharchuk by Breshears. This expert medical testimony and the lay testimony of record establishes that Breshears was not disabled prior to the accident and was disabled after the accident. This evidence is sufficient to trigger the Walton presumption that the accident combined with the preexisting disease to produce the disability. At this point, the burden of proof shifted to Security to prove the contrary. Security presented no such proof. The trial court was clearly wrong in holding that the accident did not cause Breshears’ neck disability.
These assignments of error have merit.
STATUTORY PENALTIES
(Assignment of Error Number 4)
Breshears contends the trial court erred in not finding that Security and Hartford were arbitrary and capricious in denying workers’ compensation benefits.
La.R.S. 23:1201.2 provides, in pertinent part, as follows:
Any insurer liable for claims arising under this Chapter, and any employer whose liability for claims arising under this Chapter is not covered by insurance, shall pay the amount of any claim due under this Chapter within sixty days after receipt of written notice. Failure to make such payment within sixty days after receipt of notice, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject employer or insurer, in addition to the amount of the claim due, to payment of all reasonable attorney’s fees for the prosecution and collection of such claim, or in the event a partial payment or tender has been made, to payment of all reasonable attorney’s fees for the prosecution and collection of the difference between the amount paid or tendered and the amount due.
La.R.S. 23:1201(E) provides as follows:
If any installment of compensation payable without an order is not paid within the time period provided in Subsections (B), (C), or (D) of this Section, there shall be added to such unpaid installment a penalty of an amount equal to twelve percent thereof, which shall be paid at the same time as, and in addition to, such installment of compensation, unless such nonpayment results from conditions over which the employer or insurer had no control. Whenever the employee’s right to such benefits has been reasonably controverted by the employer or his insurer, the penalties set forth in this Subsection shall not apply. The twelve percent additional payment shall be assessed against either the employer or the insurer, depending upon who was at fault in causing the delay. No worker’s compensation insurance policy shall provide that this sum shall be paid by the insurer if the director or the court determines that the twelve percent additional *736 payment is to be made by the employer rather than the insurer. Any additional installment of compensation paid by the employer or insurer pursuant to this Section shall be paid directly to the employee.
A claimant seeking statutory penalties has the burden of proving his entitlement thereto. Cf. Chiasson v. Lafourche Parish Council, 449 So.2d 110 (La.App. 1st Cir.1984). The trial court found there was a bona fide dispute between the parties and denied the claim for statutory penalties. After reviewing the record, we cannot say this factual finding is clearly wrong.
This assignment of error is without merit.
EXTENT OF DISABILITY
Dr. Kucharchuk testified that Breshears needed to go through further diagnostic procedures, was unable to work, had a 50% chance of needing surgery, and had a 10% to 15% total body disability. In this factual setting, Breshears has not reached maximum medical recovery. From the evidence of record, we are unable to determine if Breshears will be permanently disabled after he receives appropriate medical treatment. La.R.S. 23:1221(2). If he is not permanently disabled, he may be entitled to supplemental earnings benefits or permanent partial disability benefits after treatment. La.R.S. 23:1221(3) and (4). Thus, Breshears is entitled to temporary total benefits until his circumstances change. La.R.S. 23:1221(1). Cf. Keith v. Louisiana State Office of Risk Management, 516 So.2d 440 (La.App. 1st Cir.1987).
DECREE
For the foregoing reasons, the judgment of the trial court’s finding that there was no causal link between the accident and Breshears’ neck injury and limiting his temporary total disability benefits to six weeks is reversed, and judgment is rendered in favor of Breshears and against Security and. Hartford for'¡ temporary total disability benefits for an indefinite period of time, subject to a credit for the six weeks previously paid, and for all necessary medical expenses and all costs of these proceedings. Breshears is entitled to legal interest on each unpaid benefit payment from its due date until paid.
REVERSED AND RENDERED.

. An employee-plaintiff in a workers’ compensation case bears the burden of proving that his employment caused the accident, the accident caused an injury, and the injury caused his disability. Bridgewater v. Crown Zellerbach, 449 So.2d 515 (La.App. 1st Cir.1984). In the instant case, the trial court found as fact that there was an accident caused by the employment, the accident caused injury to the shoulder but not the neck, and the shoulder injury caused a temporary total disability of six weeks. Security and Hartford have not answered the appeal to contest the factual finding that there was an employment-related accident.