456 So.2d 650 (1984)
Arvin Douglas MORGAN, Plaintiff-Appellee,
v.
WILLIS-KNIGHTON MEDICAL CENTER, Defendant-Appellant.
No. 16387-CA.
Court of Appeal of Louisiana, Second Circuit.
August 22, 1984.
Rehearing Denied September 21, 1984.
*653 Watson, Blanche, Wilson & Posner by Todd A. Rossi, Baton Rouge, for defendant-appellant.
Edmund M. Thomas, Shreveport, for plaintiff-appellee.
Before JASPER E. JONES, FRED W. JONES, Jr. and SEXTON, JJ.
SEXTON, Judge.
Plaintiff filed suit for injuries to his right ulnar nerve which were allegedly sustained when he was anesthetized for surgery. The trial court granted judgment in plaintiff's favor in the amount of $95,472.93. We affirm.
Plaintiff in this cause is Arvin Douglas Morgan, a 56 year old Shreveport resident. Mr. Morgan is employed by Ford Motor Company as a territorial field manager who oversees the sale of parts and service. Defendant is Willis-Knighton Medical Center, a Louisiana corporation which owns and operates a Shreveport hospital.
Subsequent to the onset of bleeding in the urinary tract in the fall of 1980, the plaintiff was hospitalized in the defendant institution on October 8, 1980. The following day a cystoscopic examination under a general anesthetic revealed a tumor on the bladder. The tumor was surgically removed by Dr. Tommy Mook, a local urologist, under a general anesthetic on October 10, 1980.
Plaintiff's anesthetic was administered by registered nurse-anesthetist Robert Kelly. At trial Dr. Mook and Robert Kelly possessed little recollection of this specific procedure but did testify as to the standard procedures generally utilized in the surgical procedure employed on the plaintiff. This testimony established that the type operating table which was used is that which is normally utilized in natal deliveries to allow the surgeon to operate while standing between plaintiff's legs.
Plaintiff's left arm was placed on and supported by a narrow leaf or platform which extended outward from the operating table in an angle perpendicular to plaintiff's body during surgery. Plaintiff's left arm was placed on this extended platform to facilitate the placement of the IV in that arm. Plaintiff's right arm was allowed to rest, unpadded, on the operating table, parallel and adjacent to his body. The surface of the operating table upon which plaintiff's surgery was performed was equipped with approximately one and a half inch of padding. However, there was no protective padding on the vertical, metal edge or side of the operating table which descended from the table's upper surface.
Plaintiff testified upon regaining consciousness subsequent to surgery that
I woke up with a stinging sensation in my arm and hand and my mouth and it felt like I had gone to sleep with my *654 hand underneath my head and it was asleep and I was trying to shake it loose and of course, it wouldn't go.
Plaintiff's daughter, Patricia Morgan Price, verified that, shortly after regaining consciousness and in the presence of his family and friends, Mr. Morgan complained to a nurse of pain in his right arm. Ms. Price further testified that the plaintiff directly informed members of his family of his difficulty with his right arm, relating that his right hand "was tingling ... like it was ... asleep[,] ... [that] it was hurting," and that "[h]is arm felt real heavy." Plaintiff's friend Jeffrey Clement testified that the plaintiff complained of pain in his arm, when Mr. Clement briefly visited him shortly after his operation. Plaintiff's close acquaintance James Silvio testified that plaintiff complained to him of pain in his right hand and arm on the day of the operation, shortly after surgery, while Mr. Morgan was still groggy from the effects of the anesthetic. Mr. Silvio further confirmed that the plaintiff "complained about his [right] arm continuously after the operation."
Another acquaintance of plaintiff, Mary Skaggs, visited plaintiff at the hospital shortly after surgery. Ms. Skaggs testified that plaintiff "said the only complaint that he had was that he had numbness in his arm. He was flexing his hand and said his hand was numb."
On October 28, 1980, two weeks after discharge from Willis-Knighton, plaintiff was examined by his surgeon, Dr. Tommy Mook. Plaintiff at that time was suffering from a painful tingling sensation in his right arm and hand that had begun at the completion of his surgery. Dr. Mook told plaintiff that he (Dr. Mook) thought that the plaintiff had suffered damage to the ulnar nerve of his right arm, and referred plaintiff to a Dr. Waddell. The ulnar nerve runs the length of the arm, along the "ulnar groove" in the elbow, to the hand, supplying the hand with motor and sensory functions. Dr. Waddell agreed with Dr. Mook's diagnosis of a damaged ulnar nerve, and referred plaintiff to Dr. Wallace Brown for further testing. Dr. Brown conducted electromyograph (EMG) tests on plaintiff's elbow. These tests confirmed that plaintiff had a damaged ulnar nerve in his right arm, and that the burning, stinging sensation in plaintiff's right arm was a direct result of the ulnar nerve damage. Plaintiff subsequently consulted with Drs. Dienst and Boykin about his arm, and submitted to further EMG testing by Dr. Brown. Dr. Boykin, a neurosurgeon, told plaintiff, after the second battery of EMG tests, that surgery would be required to remedy plaintiff's condition.
Plaintiff was admitted to Schumpert Medical Center in Shreveport on August 17, 1981, operated on by Dr. Boykin on August 18, and discharged from hospitalization on August 21, 1981. The purpose of the operation, as Dr. Boykin succinctly stated it, was to "put the [ulnar] nerve in a different position so that he would not continue to traumatize it everytime that he flexed his arm at the elbow." Plaintiff's sutures were removed, following this surgical procedure, on August 26, 1981.
Plaintiff filed suit on October 8, 1982, alleging that the ulnar nerve of his right arm had been damaged during the surgical removal of his bladder tumor in October of 1980, while plaintiff was sedated under general anesthesia. In a judgment rendered October 26, 1983, the trial court awarded judgment in plaintiff's favor and against the defendant in the amount of $95,472.93. In its well-written reasons for judgment, the trial court found that the doctrine of res ipsa loquitur applied to defendant's acts and omissions. The trial court thus concluded that defendant was negligent and civilly liable for the injury to the ulnar nerve in plaintiff's right arm. The trial court's award included a $50,000 sum for general damages, $40,000 for lost future income, $2,653.63 for lost past income, and $2,819.30 in special damages for the expenses incurred by plaintiff in obtaining medical treatment for the injury to his right ulnar nerve.
The defendant presents two basic contentions on appeal. In its first assignment, *655 the defendant contends that the trial court erred in finding it negligent and liable for plaintiff's injuries. In its second assignment, defendant contends that the trial court erred in awarding excessive damages.

I.

LIABILITY
Because plaintiff was anesthetized and unconscious at the time of his injuries, he was therefore compelled, in asserting his claims, to rely on the tort doctrine of res ipsa loquitur.
Res ipsa loquitur is not a substantive legal tenet, but rather an evidentiary doctrine under which a tort claim may be proved by circumstantial evidence. Smith v. International Paper Co., 299 So.2d 437 (La.App. 2d Cir.1974), writ denied, 302 So.2d 310 (La.1974). This evidentiary doctrine is applicable where defendant has actual control of the agency, instrumentality or conditions which caused plaintiff's injuries; the evidence as to the true cause of plaintiff's loss is more readily accessible to defendant than plaintiff; and the accident is of a kind that does not occur in the absence of negligence and/or the circumstances attending the accident create an inference of negligence on the part of defendant. Langlinais v. Geophysical Service, Inc., 111 So.2d 781 (La.1959); Northwestern Mutual Fire Ass'n v. Allain, 226 La. 788, 77 So.2d 395 (1954); Dorman v. T. Smith & Son, 223 La. 29, 64 So.2d 833 (1953); Ray v. Ameri-Care Hospital, 400 So.2d 1127 (La.App. 1st Cir. 1981), writ denied, 404 So.2d 277 (La.1981). Under the principle of res ipsa loquitur, the defendant's negligence is inferred because, under the facts shown, the inference that defendant's negligence caused plaintiff's harm is probable and more plausible than any other explanation propounded. See Boudreaux v. American Ins. Co., 262 La. 721, 264 So.2d 621 (1972). It is crucial to note that, where the doctrine of res ipsa loquitur is properly applicable, the plaintiff need not establish the exact manner in which he was injured, or the precise act or event which precipitated his injury. Boudreaux, supra.
It should be noted, however, that the principle of res ipsa loquitur does not dispense with the requirement that the plaintiff prove negligence by a preponderance. This principle merely modifies the process of proof. A plaintiff relying on the res ipsa loquitur doctrine must accordingly prove circumstances which create an inference of negligence on the part of defendants. Parr v. D.H. Holmes Co., Ltd., 311 So.2d 463 (La.App. 4th Cir.1975). This places upon the defendant the burden of going forward with proof to nullify that inference. However, this inference must be weighed with all other proof in determining whether the plaintiff has satisfied the required evidentiary burden of a preponderance of the evidence. Boudreaux, supra; Larkin v. State Farm Mutual Automobile Ins. Co., 233 La. 544, 97 So.2d 389 (1957); Alexander v. St. Paul Fire & Marine Ins. Co., 312 So.2d 139 (La.App. 1st Cir.1975), writ denied, 313 So.2d 846 (La. 1975).
The medical testimony leaves no doubt as to the actual existence of the injury to plaintiff's right ulnar nerve. It is therefore necessary to determine whether the res ipsa loquitur doctrine was correctly utilized by the trial court in ascertaining that the defendant, Willis-Knighton Medical Center, caused plaintiff's injuries.
It is clear, in the first instance, that defendant's personnel had actual control of the instrumentalities, conditions and circumstances which caused plaintiff's injuries. The medical testimony adduced clearly established that the Willis-Knighton employee, nurse anesthetist Robert Kelly, had medical responsibility for the care, protection and supervision of the plaintiff for the entire time that he was under general anesthetic. Expert anesthesiologist Dr. Jack Collins testified that
The anesthetist is responsible for the protection and care of that patient and has an obligation to protect the patient during the course of the anesthetic *656 against all incidents which might occur during that time.
Mr. Morgan was anesthetized and therefore unable to control or direct his own movements or actions, or to protect himself. The anesthetist and the surgical staff possessed sole control over the movement, positioning and protection of the plaintiff while under the anesthetic. Dr. Collins testified that the need for extraordinary precaution is obvious with respect to anesthetized subjects, since a patient's ordinary protective responses are deactivated by general anesthesia.
It is further clear, in the second instance, that the evidence as to the true cause of plaintiff's injury is more readily accessible to defendant than plaintiff for the obvious reason that plaintiff was anesthetized and unconscious while the events which precipitated his injury transpired. In this sense, the facts of this cause constitute a classic object for the application of the res ipsa loquitur doctrine.
It appears, moreover, that the injuries to plaintiff's ulnar nerve are of a kind that do not ordinarily occur in the absence of negligence. The medical testimony established that ulnar injuries are normally caused by the undue pressure or by being struck with hard or solid objects. We feel it is reasonable to conclude, as did the trial court, that plaintiff's injury would not have occurred without undue pressure on, or a direct blow to, the ulnar nerve. We further find reasonable the conclusion that the most probable cause of undue pressure or excessive impacts would be improper placement, positioning or moving of the plaintiff, lack of protective padding; or an inadvertent blow to the ulnar nerve.
The fact that plaintiff's injury occurred in an anatomical region (right arm) which was not operated on further supports the inference that his injury was of the kind that would not have occurred absent negligence. See McCann v. Baton Rouge General Hospital, 276 So.2d 259 (La.1973); Holloway v. Southern Baptist Hospital, 367 So.2d 871 (La.App. 4th Cir.1978). Furthermore, it appears that absolutely no padding was placed on the right arm of plaintiff to protect his ulnar nerve. Plaintiff introduced into evidence the medical text entitled Anesthesia[1] by Ronald D. Miller, M.D. Dr. Miller acknowledges therein that an arm extended on a platform during surgery at a right angle to the bodysuch as is ordinarily the case with the arm into which the IV is insertedmay not require padding. However, Mr. Miller states that special precautions are required with respect to the arm which is allowed to lay adjacent and parallel to the patient's body during surgery. In the absence of padding and securing of the arm, the elbow may hang over the edge of the operating table during surgery, thereby sustaining a pressure-induced injury to the ulnar nerve. Anesthesia, supra, at 111. Dr. Miller's text notes that the correct way to protect the ulnar nerve is with padding and that it is medically incorrect to fail to do so. Anesthesia, supra, at 111. Dr. Collins stated in this vein that injuries to the ulnar nerve during surgery are foreseeable, and that the proper method of protecting against this foreseeable injury is to "use padded arm boards and also pad the arms to protect the ulnar nerve where it passes around the medial epicondyle of the humerus."
It is true that plaintiff may not avail himself of the res ipsa loquitur doctrine where the hypothesis that plaintiff's injuries were not caused by defendant's negligence is equally plausible as the postulate that plaintiff's injuries were caused by defendant's negligence. Aetna Casualty & Surety Co. v. Rothman, 331 So.2d 81 (La.App. 1st Cir.1976). However, the testimony adduced at trial clearly established that plaintiff experienced no difficulty with his arm prior to his surgery on October 9, and that the onset of pain and disability occurred concurrently with plaintiff's awakening from the effects of the general anesthetic administered him. The injured arm was not the subject of the operation, or any other medical treatment. Moreover, *657 the plaintiff showed that strict care, including padding of the arm, was necessary to protect the arm and the ulnar nerve therein during an operation of this type. It therefore follows that plaintiff's injuries were caused by events while he was under general anesthetic as a result of inadvertent acts or omissions which constitute negligence. Plaintiff thus has preponderantly established that his injuries are the kind that would not normally occur in the absence of negligence, and that the application of the doctrine of res ipsa loquitur is appropriate in this cause.
Defendant's primary defense consisted of the testimony of seven medical aides at Willis-Knighton who testified that they did not recall having received any complaints of arm pain from plaintiff during his period of hospitalization. However, the trial court specifically addressed the testimony of Willis-Knighton's medical aides, weighed it against the affirmative testimony of plaintiff's witnesses that Arvin Morgan made specific complaints about arm pain, and concluded that the plaintiff's testimony in this respect was more persuasive. The trial court clearly stated, in this connection, that:
(T)he Defendant produced the testimony of the nurses and aids who assisted Plaintiff while he was in the hospital. Each of these staff members testified they did not remember Mr. Morgan making any complaints about pain or difficulty in his arm, and that had he made those complaints they would have noted them in his chart and reported the complaints to his physician....
The testimony given by [plaintiff's witnesses] Mr. Morgan, Mrs. Morgan, Mrs. Price, Ms. Skaggs, Mr. Silvio and Mr. Clements was clear, specific, affirmative, and, most importantly, credible. After listening to the testimony of those witnesses we were impressed with their sincerity, credibility and veracity. This Court does not believe that they would have testified falsely about Mr. Morgan's complaints of pain and discomfort in his arm immediately after surgery if those complaints had not been made. We conclude that their testimony is accurate and that the witnesses who testified for the Defendant were simply mistaken in their recollection of the events.
In light of the compelling circumstantial and direct evidence of plaintiff, the trial court's rejection of the defense evidence is not clearly wrong and will not be disturbed by us. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). We therefore concur in the trial court's application to this cause the doctrine of res ipsa loquitur and agree that the defendant is liable for plaintiff's injuries.

II.

GENERAL DAMAGES
The defendant does not challenge the damages awarded the plaintiff for past medical expenses and loss of past earnings, but rather contests the $50,000 award for general damages, and the $40,000 for loss of future earnings.
Before an appellate court can disturb a quantum award, the record must clearly reveal that the trier of fact abused its discretion in making the award. An award made in the trial court may not be modified unless it is unsupported by the record. The appellate question is not whether a different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971); Black v. Ebasco Services, Inc., 411 So.2d 1159 (La.App. 1st Cir.1982); Greene v. Wright, 365 So.2d 551 (La.App. 1st Cir. 1978). Moreover, the appellate function in reviewing quantum is limited to raising inadequate awards to the lowest amount the trial court could have reasonably awarded, and lowering excessive awards to the highest amount the trial court could have reasonably awarded. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, supra; Alexander v. Leger, 423 *658 So.2d 731 (La.App. 3d Cir.1982); Greene v. Wright, supra. In the final analysis, the damages due in a given case must reflect the facts and circumstances of that case. Alexander v. Leger, supra; Wilkinson v. Hartford Accident & Indemnity Co., 421 So.2d 440 (La.App. 3d Cir.1982); Profit v. Linn, 346 So.2d 253 (La.App. 1st Cir.1977).
General damages are those which may not be fixed with pecuniary exactitude; they instead involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitively measured in monetary terms. Boswell v. Martin Lumber Co., Inc., 363 So.2d 506 (La.1978); Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974).
The general damages sustained by plaintiff in this cause are a function of his physical impairment, his pain and suffering, and the resultant restriction of his lifestyle.
Dr. Edward Krusin, Department Chief of Baylor University Medical Center and pioneer in the use of electromyographs, examined plaintiff in December of 1982 after surgery was performed on him in August of 1981 to repair the ulnar nerve. Dr. Krusin testified that plaintiff's ulnar nerve injury has resulted in decreased sensation in the little finger and ring finger of the right hand, and an atrophying of the muscles of the right forearm. Dr. Krusin also noted that plaintiff was suffering from causalgia, or a painful condition normally associated with partial nerve damage. Although Dr. Krusin noted that causalgia has a tendency to improve over time, he acknowledged that there was a significant possibility that the pain in plaintiff's right arm would not disappear. Dr. Krusin assigned plaintiff a 27% disability of the right arm, and a 16% impairment of the body as a whole.
Plaintiff's job as a territorial field manager for Ford Motor Company entails hundreds of miles of driving each week, and his injury causes great discomfort to him while driving. Plaintiff cannot grip items such as lawnmowers, and his treating physician testified that plaintiff's writing has lapsed into virtual illegibility due to the injury. Plaintiff has been forced to abandon his thirty year avocation of repairing and building clocks.
The effects of plaintiff's injury are exacerbated as a result of a serious left shoulder injury sustained while playing college football. Plaintiff therefore has some impairment in both upper extremities and suffers from an understandable sleeplessness and upset caused by the pain and discomfort, a condition which was still requiring medication at the time of trial.
Based on pain, functional impairment and modification of lifestyle caused by the injury to plaintiff's right ulnar nerve, we conclude that the trial court did not err in awarding plaintiff $50,000 in general damages.

III.

LOST FUTURE INCOME
Awards for loss of future income are inherently speculative, and are intrinsically insusceptible of being calculated with mathematical certainty. Thus, the courts must exercise sound judicial discretion in determining these awards, and render awards which are consistent with the record and which work an injustice on neither party. Robinson v. Graves, 343 So.2d 147 (La.1977); Edwards v. Sims, 294 So.2d 611 (La.App.1974); Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968); Holmes v. Texaco, Inc., 422 So.2d 1302 (La.App. 5th Cir.1982); Black v. Ebasco Services, Inc., 411 So.2d 1159 (La.App. 1st Cir.1982); Payton v. Travelers Ins. Co., 373 So.2d 1324 (La.App. 4th Cir.1979).
A number of factors must be analyzed in determining loss of future income, including the plaintiff's physical condition before and after his injury; his past work record and the consistency thereof; the amount plaintiff probably would have earned absent the injury complained of; and the probability he would have continued *659 to earn wages over the balance of his working life. Viator v. Gilbert, supra; Payton v. Travelers Ins. Co., supra. It is well established that a loss of future income award is not merely predicated upon the difference between a plaintiff's earnings before and after a disability injury. Such an award is predicated, more strictly considered, upon the difference between a plaintiff's earning capacity before and after a disabling injury. Folse v. Fakouri, 371 So.2d 1120 (La.1979); Ward v. Louisiana & Arkansas Railway Co., 451 So.2d 597 (La.App. 2d Cir.1984); Green v. Farmers Ins. Co., 412 So.2d 1136 (La.App. 2d Cir.1982); Hill v. Sills, 404 So.2d 1323 (La. App. 2d Cir.1981). Loss of future income awards thus encompass the loss of a plaintiff's earning potential the loss or reduction of a persons' capability to do that for which he is equipped by nature, training, and experience, and for which he may receive recompense. Coco v. Winston Industries, Inc., supra; Naylor v. La. Dept. of Public Highways, 423 So.2d 674 (La. App. 1st Cir.1982); Mizell v. State, Through La. Dept. of Highways, 398 So.2d 1136 (La.App. 1st Cir.1980); Falcon v. Bigelow-Liptak Corp., 356 So.2d 507 (La. App. 1st Cir.1977). In computing loss of future income, it is first necessary to determine whether and for how long a plaintiff's disability will prevent him from engaging in work of the same or similar kind to that he was doing at the time of his injury; it is necessary to ascertain whether he has been disabled from work for which he is fitted by training and experience. Viator v. Gilbert, supra.
Plaintiff was not prevented by his ulnar nerve injury from returning to his job as field manager for Ford Motor Company. However, his injury irreparably damaged the motor, sensory and gripping functions essential to clock making and clock repair. Plaintiff presented evidence that he had been engaged in an active and lucrative sideline of clock making and repair, learning this trade from his uncle as a youth; that he was skilled at said trade; that he had abandoned this avocation at the direct request of Ford Motor Company in 1962; that he had fully anticipated resuming this trade upon retiring from Ford at the age of 62; and that he anticipated pursuing this avocation on a part-time basis to generate retirement income. Plaintiff also presented expert testimony by a rehabilitation specialist, Dr. Richard Galloway, that he could be expected to pursue this trade for ten years subsequent to retirement from Ford Motor Company given his work-life expectancy. There was also testimony from economist Terrance Clauretie that, assuming part-time involvement and the earnings generally generated by clock repairmen, plaintiff could expect to earn upwards of $100,000 in post-retirement income through clock manufacturing and repair.
Assessing this evidence along with that presented by defendant, it is clear to this court that the trial court did not abuse its vast discretion in determining that plaintiff was legally entitled to $40,000 representing lost future income.
For the foregoing reasons, the trial court's determination under the doctrine of res ipsa loquitur that the defendant is liable to plaintiff, and its award of $95,472.93, is in all respects affirmed, with judicial interest from the time of legal demand. All costs are assessed to defendant-appellant, Willis-Knighton Medical Center.
AFFIRMED.
NOTES
[1] Edited by Ronald D. Miller, M.D., Vol. 1 (Churchill Livingstone, 1981).