479 So.2d 583 (1985)
Mary Janet VIAL
v.
Dr. H.P. ARMSTRONG and Zurich Insurance Company.
No. CA 84 0987.
Court of Appeal of Louisiana, First Circuit.
November 19, 1985.
Writs Denied January 24, 1986.
Leon C. Vial, III, Hahnville, R. Bruce Macmurdo, Baton Rouge, for plaintiff-appellant Mary Janet Vial.
R. Michael Caldwell, Baton Rouge, for defendants-appellees.
Before LOTTINGER, COLE and CRAIN, JJ.
CRAIN, Judge.
The only issue presented in this personal injury suit is quantum.
On May 1, 1980, plaintiff, Mary Janet Vial, was driving north on Nicholson Drive in Baton Rouge when she was involved in a vehicular collision with a car driven by *584 Keith Armstrong, the minor son of Dr. H.P. Armstrong, defendant. Dr. Armstrong's liability insurer, Zurich Insurance Company, was also made a defendant. Trial of this matter was held on January 17, 1984, after which the case was taken under advisement. On May 29, 1984, judgment was rendered in favor of Ms. Vial awarding her $20,000 for general damages and $2,130.06 for past medical expenses. Ms. Vial's claims for loss of earning capacity and future medical expenses were denied as being too speculative. Ms. Vial appealed this judgment, contending the amount awarded is inadequate compensation for her injuries.
Ms. Vial was the only witness who testified in person at the trial held on this matter. In addition, the depositions of four medical doctors were introduced.
Immediately after the accident Ms. Vial began experiencing severe pain in her shoulders and neck. A friend took her to the emergency room of the Baton Rouge General Hospital, where she was examined and released. A few days later she saw Dr. Grace in Plaquemine. No evidence was offered regarding this visit, although Ms. Vial stated Dr. Grace found the results of her examination to be normal.
Approximately two weeks later Ms. Vial, who was an LSU student at the time, returned to her home in Hahnville for the summer and attended Nicholls State University in Thibodaux. She testified she suffered pain in her neck and shoulders throughout the summer. During this period she consulted Dr. Phemister in Luling on May 15, July 20 and September 15, 1980. No evidence was offered regarding these visits.
Ms. Vial returned to LSU for the fall semester. She stated she continued to suffer pain throughout the fall, but did not seek further medical treatment until February 2, 1981, when she consulted Dr. Moss Bannerman, an orthopedic surgeon. This examination was apparently normal. No evidence was introduced regarding it.
On April 21, 1981 Ms. Vial saw another orthopedic surgeon, Dr. Charles Strange, complaining of pain in her neck and shoulders. She indicated this pain was accentuated by strenuous physical activity or extended sitting. The results of the examination performed by Dr. Strange were essentially normal, except for some pain experienced by Ms. Vial at the very extremes of flexion and motion. The x-rays taken on that date also appeared normal. Ms. Vial saw Dr. Strange again on August 6, at which time she had the same basic complaints. Dr. Strange stated Ms. Vial told him at this time she felt she was getting better slowly. At trial Ms. Vial denied making such a statement. In any event, at her last visit on September 18, 1981, Ms. Vial's complaints were again basically the same as those initially given by her. Dr. Strange felt her complaints of pain were authentic. He diagnosed Ms. Vial's injury as a subacute and chronic cervical sprain, which he did not feel would cause any permanent residual disability.
On March 12, 1982, Ms. Vial was seen at the request of the defendant insurance company by Dr. Robert Hanchey, a neurosurgeon. Dr. Hanchey stated his examination was essentially negative, except for some mild weakness in the right triceps and some sensory loss. He felt a myelogram was necessary for a conclusive diagnosis, although he believed it would probably be negative.
On February 1, 1982, Ms. Vial consulted Dr. John Jackson, a neurosurgeon, with complaints of pain in her right arm, right hand and neck. She also complained of numbness in her right hand and radiating pain in her right shoulder. During his initial examination, Dr. Jackson noted a marked difference in the grip strength of Ms. Vial's right and left hands, with the right hand being much weaker. In addition, he noted some decreased sensation in the third, fourth and fifth fingers of her right hand. The results of this examination were otherwise normal. From this examination and x-rays taken on that date, Dr. Jackson concluded Ms. Vial probably suffered either a nerve stretch injury or a cervical disc injury. Based on the results *585 of an EMG later performed, he initially thought it more likely she had sustained a nerve stretch injury. However, another EMG subsequently performed appeared to rule out this possibility.
Dr. Jackson felt an x-ray taken on April 17, 1982 showed a definite fracture of the lamina at the C2 level. Although he had not noted a fracture on earlier x-rays, Dr. Jackson indicated it was not unusual for a fracture not apparent on earlier x-rays to show up on a subsequent x-ray. He stated there were many reasons for this, ranging from the angle of the camera to the fact some fractures become more distinct as time passes. In any event, while Dr. Jackson did not think this fracture was the major cause of Ms. Vial's problems, he believed it may have caused some of the pain in her neck. Additionally, he felt it demonstrated Ms. Vial had experienced a rather severe trauma to her cervical spine.
Ms. Vial visited Dr. Jackson again on May 4, June 24 and August 30, 1982. On the August 30 visit she complained that her pain had worsened. A CT scan was performed on September 8, 1982. The results of this scan were essentially normal, except for a possible bulge at the C5-6 level. At that time, Dr. Jackson did not believe this finding was significant since there appeared to be sufficient room in the area of the possible bulge. Subsequently, however, he changed his opinion and came to believe it was likely Ms. Vial suffered from a cervical disc injury. This conclusion was based primarily on the presence of the possible bulge on the CT scan and the longevity of Ms. Vial's complaints of pain and numbness in her right hand. Dr. Jackson indicated the next step in making a positive diagnosis was a myelogram, which he believed would probably show a bulging disc at the C5-6 level. However, he recommended Ms. Vial wait before having a myelogram because he thought there was a chance her injury might heal without surgery, due to her youth. Ms. Vial had not undergone a myelogram at the time of trial.
Ms. Vial's last visit to Dr. Jackson before trial was on December 19, 1983. She was going through a relatively good period at that time and had not experienced a great deal of pain since Thanksgiving. However, she still had soreness in her neck and a burning pain radiating up the back of her right shoulder if she attempted any type of strenuous activity. Any strain in her right shoulder also caused her to suffer headaches and pain in her neck. Ms. Vial had not been released from Dr. Jackson's care at the time of trial.
Ms. Vial was also seen on several occasions by Dr. Monica Vial Benson, her first cousin. Dr. Benson is a specialist in physical medicine and rehabilitation. She saw Ms. Vial on February 8, March 17 and April 17, 1982; and on March 14, 1983. As did Dr. Jackson, Dr. Benson felt the longevity of Ms. Vial's complaints and the CT scan showing a possible bulge indicated she had suffered a disc injury. Dr. Benson did not foresee any improvement in Ms. Vial's condition without further treatment, which would probably have to be radical in nature.
The trial court concluded Dr. Strange's diagnosis of a subacute and chronic cervical sprain was the most probable diagnosis of the injury sustained by Ms. Vial. The acceptance of Dr. Strange's diagnosis as being most probable was a finding of fact which normally would be subject to the manifest error rule upon appellate review. However, in cases such as the present one, where the trial court reaches its finding based entirely on medical evidence presented through depositions and letters, a different standard of review is appropriate. The manifest error rule is not applicable in such cases because the trial court is in no better position to evaluate credibility or resolve conflicts in testimony than the reviewing court. Bridgewater v. Crown Zellerbach, 449 So.2d 515 (La. App.1st Cir.1984). When evaluating depositions rather than live testimony, a fundamental function of the reviewing court is to determine the sufficiency and preponderance of the evidence. Dawson v. State *586 Through Dept. of Corrections, 452 So.2d 357 (La.App.1st Cir.1984); F & S Offshore v. Serv. Mach. & Shipbuilding, 430 So.2d 1167 (La.App.1st Cir.1983).
Applying this standard to the medical depositions introduced in the present case, we disagree with the trial court's conclusion, finding the preponderance of the evidence indicates it is more probable than not Ms. Vial sustained a cervical disc injury. Both Drs. Jackson and Benson indicated they strongly suspected a disc injury as the source of Ms. Vial's problems.[1] Significantly, both doctors cited the longevity of Ms. Vial's complaints, the authenticity of which was not questioned, as well as the results of the CT scan as being major factors in this conclusion. In making his diagnosis Dr. Strange, who last saw Ms. Vial over two years prior to trial, did not have the benefit of either the CT scan or the knowledge her symptoms would persist for over three years. The fact these symptoms did persist so long tends to negate his diagnosis of a cervical sprain and indicate an injury of a more serious nature.
Dr. Hanchey, who examined Ms. Vial almost two years prior to trial, also did not have the benefit of the CT scan in evaluating Ms. Vial's condition. His testimony did little to establish the nature of her injuries. Although Dr. Hanchey did not believe Ms. Vial had sustained a disc injury, he felt a myelogram was necessary to determine this conclusively. He also did not suggest any alternative diagnosis consistent with Ms. Vial's symptoms. Additionally, the testimony of a treating physician, such as Dr. Jackson, who had the benefit of repeated examinations and observations of a patient should be accorded greater weight and probative value than the testimony of a physician, such as Dr. Hanchey, who has merely examined the patient once for the purpose of litigation. Dobard v. State Farm Ins. Co., 437 So.2d 366 (La.App.4th Cir.1983).
In view of our conclusion Ms. Vial has sustained a probable cervical disc injury, we must now determine whether the damages awarded by the trial court on the basis she had sustained a cervical sprain adequately compensated her for her actual injuries. Ms. Vial testified she continues to experience pain most of the time, which at times is severe and at other times a throbbing, burning pain. She also testified her injury has caused significant changes in her lifestyle. She has had to learn to do many things with her left hand, since her right hand is too weak to do many routine tasks. When she sits or stands for an extended period of time, she experiences discomfort and pain in her neck and shoulder. Ms. Vial has also been deprived by her injury of activities which she previously enjoyed. For instance, she previously enjoyed sports, but is no longer able to participate in them. Additionally, she is no longer able to play the guitar for any longer than ten to fifteen minutes without her right hand becoming stiff and sore. Before the accident she had taken guitar lessons for fourteen years and on occasion had played professionally.
Ms. Vial left LSU without graduating in December of 1982. She stated she had difficulty working and attending school because of the pain she suffered after sitting for an extended period. In May 1982, she was employed as a clerk checking inquiries on a computer terminal, but was laid off in October. She stated she frequently missed work because of pain in her neck and shoulder. Ms. Vial also stated she was interested in attending computer school to train as a computer programmer. She is currently enrolled in such a course, but is uncertain whether she will be able to complete it. She dropped out of similar courses on two previous occasions because of the pain caused by sitting at a computer terminal for long periods of time.
In efforts to improve her condition Ms. Vial has consulted numerous physicians *587 and has endured several different forms of treatment over the course of three and one-half years, including various forms of exercises, physical therapy, traction and medication. She stated these treatments have afforded her only temporary relief at best. She also underwent two EMG tests, which she described as painful. Further, it appears probable Ms. Vial will at the very least have to undergo a myleogram and quite possibly surgery in the future.
Considering these circumstances, we find an award of $40,000 is appropriate for the general damages sustained by Ms. Vial. She has undergone extensive and prolonged physical suffering in the past with every indication her pain will continue for some indefinite period of time in the future. Also, her worry, concern and mental involvement resulting from disabilities and curtailment of activities is not inconsiderable.
In this case, the trial court committed error in its interpretation of the medical depositions by utilizing a diagnosis made some two years prior to trial, when the more recent and extensive medical evidence belies that diagnosis and preponderates to establish a much more serious injury. In view of the trial court's error, the basis for its quantum award was inaccurate and unsupported by the record. It is our function, therefore, to award a sum which reflects the facts and circumstances of the case. It is especially important we do so where, as here, the medical evidence was adduced by depositions and the trial court did not have the advantage of viewing the witnesses and assessing their credibility. See Conrad v. Jack Donahue Contractors, Inc., 450 So.2d 1035 (La.App.1st Cir.1984).
We also conclude the trial court erred in denying any recovery for future medical expenses on the basis it was too speculative. An award for further medical expenses is by nature somewhat speculative. However, when a plaintiff clearly had a right to recover for future medical expenses, recovery should not be denied because it is impossible to establish the exact nature, extent and costs of the treatment which will be required. Thibodaux v. Acme Truck Lines, Inc., 443 So.2d 716 (La.App.5th Cir.1983), writ denied, 445 So.2d 439 (La.1984).
At trial Ms. Vial testified she was still experiencing pain and discomfort from her injury, making it probable she will require additional treatment. In fact, Ms. Vial was still under Dr. Jackson's care at this time. It appears likely she will have to undergo a myelogram and perhaps other tests. If surgery is performed, Dr. Jackson testified the cost would be approximately $8,000. Under the facts of this case, we conclude an award of $5,000 for future medical expenses is justified.
However, we find no error in the trial court's denial of an award for loss of future income. Any award for loss of future income is inherently speculative and intrinsically insusceptible of being calculated with mathematical certainty. Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App.2d Cir.1984). In making such an award it is first necessary to determine whether and for how long a plaintiff's disability will impair his earning potential. Id. Thereafter, it is necessary to consider a number of factors, including the plaintiff's physical condition before and after his injury, his past work record, the amount plaintiff probably would have earned if not for his injury and the probability plaintiff would have continued to earn wages over the balance of his working life. Id.
A loss of future income award is not predicated merely upon the difference between a plaintiff's earnings before and after a disability injury. More strictly considered, such an award is based upon the difference between a plaintiff's earning capacity before and after a disabling injury. It encompasses the loss of one's earning potentialthe loss or reduction a person's capability to do that for which he is equipped by nature, training and experience, and for which he may receive recompense. Morgan v. Willis-Knighton Medical *588 Center, supra, and the cases cited therein, p. 659.
In the present case there is no evidence from which we could make a determination of lost future income. Most importantly, it is not even clear whether or for how long Ms. Vial's earning potential will be impaired. Dr. Benson was the only physician who made any reference to any disability suffered by Ms. Vial. Dr. Benson admitted she had not done a formal disability study, but said she "could ballpark a 20 to 30 percent total disability." However, she cautioned any disability would depend upon the outcome of any further treatment. For these reasons, we are unable to assign much probative value to Dr. Benson's estimate. In view of the total lack of evidence as to this item, any award for loss of future income in the present case would be totally speculative and unsupported by the record.

DECREE
For the reasons given above, the judgment of the trial court is amended to increase the award for general damages from $20,000 to $40,000 and to include an award for future medical expenses in the amount of $5,000. The judgment of the trial court is affirmed in all other respects. Costs are assessed against defendants.
AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] We note it could be argued Dr. Benson's testimony may be biased because she is closely related to Ms. Vial. However, we believe the fact Dr. Benson's testimony and that of Dr. Jackson are corroborative of one another, tends to negate this argument.