WATKINS, Judge.
This appeal presents the question of whether or not a refusal to give an instruction on res ipsa loquitur in a medical malpractice case usurps the province of the jury. After all the evidence was presented, the trial judge considered the evidence and made a determination that the doctrine was not applicable. The action of the trial *91 judge was pursuant to the mandate of LSA-R.S. 9:2794(C).
We agree with appellants that the statute operates to establish a dichotomous decision-making process: first, the trial judge; then, the jury. But appellants’ objection to the process belongs in the legislative arena, not in the courts. Consequently, we affirm the judgment of the trial court in favor of the defendants.
FACTS
On November 26,1982, Marion A. Cange-losi, Sr., a 68-year-old male, was admitted to Our Lady of the Lake Regional Medical Center in Baton Rouge, Louisiana, as a candidate for gallbladder surgery.
Mr. Cangelosi had a long history of major health problems: diabetes, heart attack, pacemaker surgery, and chronic congestive heart failure. At the time of his admission he exhibited an abnormal breathing pattern, swollen liver, and leg and ankle swelling. A cardiology consultation was arranged and because of the patient’s congestive heart failure, the surgery for gallbladder removal was delayed.
By December 2, 1982, Mr. Cangelosi’s condition was maximally compensated, that is, he was as well as he could be. Although surgery was scheduled for the next day, he remained a high risk candidate.
Mrs. Ann Ashbaugh, a certified registered nurse anesthetist employed by Anesthesiology Group Associates, anesthetized Mr. Cangelosi. Because he was a high risk patient from a general health standpoint, Mrs. Ashbaugh asked Dr. Martin Peuler, an anesthesiologist from the same group, to be present while the patient was intubated and anesthetized. Dr. Peu-ler observed the entire process but did not touch the patient.
Intubation is the placement of an endo-tracheal tube in the patient; it serves several purposes. The tube provides a conduit for the anesthesia gases and for the oxygen used to awaken the patient; it can be used for emergency medication during surgery if needed; it guarantees the patency of the airway in an emergency; and, it prevents backflow of anesthesia gases and aspiration into the lungs. In this particular case the intubation was continued for 53 hours, during which time the tube provided a conduit for mechanical respiration.
The process of intubation is explained several times in the record. A plastic tube is inserted into the patient’s mouth and passed through the larynx (voice box), between the vocal cords, and into the trachea (windpipe). When the tube is in place, a cuff (balloon) at the end is inflated to seal the trachea.
Intubation can be performed with or without what is called a stylet. This is a length of flexible aluminum tubing which holds its shape when bent and which is placed inside an endotracheal tube to help conform the tube to the contours of the patient’s anatomy. Although stylets are used routinely at some hospitals, Mrs. Ash-baugh testified that she does not approve of the device and has never used one to intubate any patient. She stated that she did not deviate from her normal practice in Mr. Cangelosi’s case; a stylet was not used to intubate him. Her testimony was corroborated by Dr. Peuler who watched the intubation.
In Mr. Cangelosi’s case the entire intubation process, and indeed the entire surgery, was uneventful. He was moved to the intensive care unit where he was maintained on a respirator. During Mr. Cange-losi’s period of intubation, the cuff pressure was monitored by the respiratory therapy department of Our Lady of the Lake Regional Medical Center. The patient was visited on a frequent basis by various physicians who also checked the cuff pressure. Chest x-rays during this period confirmed satisfactory placement of the endotracheal tube.
On December 5, 1982, Dr. James Oster-berger checked Mr. Cangelosi on morning rounds and determined it was time to remove him from the respirator. Dr. Oster-berger performed the extubation without difficulty. The patient was moved from intensive care to a hospital room.
Beginning on December 6, and persisting and increasing until December 9, Mr. Can- *92 gelosi showed symptoms of breathing and throat problems. Dr. Charles Mitchell, an otolaryngologist (specialist in ENT medicine), was called in for consultation. The patient was moved back to intensive care. Dr. Mitchell diagnosed laryngeal edema (swelling), secondary to the endotracheal intubation, and he prescribed medication.
Two days later Mr. Cangelosi’s voice was returning and his symptoms had disappeared. The patient was so improved that Dr. Mitchell signed off the case. Mr. Can-gelosi was once more transferred out of intensive care, and on December 14, 1982, he was released from the hospital.
Mr. Cangelosi was seen by Dr. Ronald Radzikowski, the specialist in internal medicine who initially recommended the gallbladder removal, at an office visit on December 29, 1982. The doctor observed that Mr. Cangelosi was breathing normally and complained of no distress or discomfort. He was instructed to return in six to eight weeks.
However, on January 4,1983, Mr. Cange-losi returned and was seen by Dr. Oster-berger. Noting hoarseness, shortness of breath, and possible laryngeal edema in the patient, Dr. Osterberger made arrangements for him to be seen at the hospital emergency room by Dr. Mitchell. On fiber-optic examination, Dr. Mitchell found what he thought was tracheal stenosis (narrowing of the internal diameter of the windpipe), and he concluded that a laser bron-choscopy was in order. The patient was referred to Dr. Daniel Mouney, an ENT specialist in New Orleans.
On January 5, 1983, Dr. Mouney found it necessary to perform a tracheostomy on Mr. Cangelosi for airway control. A direct laryngoscopy revealed that the patient had a relatively small trachea and that two of the series of cartilage rings which maintain the shape of the trachea were separated to the front and were protruding into and reducing the size of the interior diameter of the windpipe. Dr. Mouney observed unusually mature scar tissue, but later learned that this patient forms such tissue at á rapid rate. Since the beginning of 1983, Mr. Cangelosi has undergone a number of laser procedures to reduce the scarring and maintain the size of the airway. At the time of trial, he was a patient in a nursing home, having been admitted there following a stroke which is unrelated to the present lawsuit.
TRIAL COURT ACTION
Mr. Cangelosi and his wife filed suit against numerous health care providers, alleging that his tracheal injury and subsequent permanent tracheostomy resulted from malpractice which occurred at the in-tubation, during the period of intubation, and/or at extubation. The original defendants were:
1. Out Lady of the Lake Regional Medical Center, the hospital where Mr. Cange-losi had his surgery; the supplier of the endotracheal tube, and the employer of the respiratory technologists who monitored the cuff pressure; appellee dismissed on directed verdict after court’s ruling on jury instruction.
2. Dr. Ronald Radzikowski, a specialist in internal medicine who recommended the gallbladder surgery, but who did not see the patient while he was intubated; appel-lee dismissed on directed verdict at close of plaintiff’s case.
3. Dr. James Osterberger, a specialist in internal medicine and Dr. Radzikowski’s partner, who performed the extubation; appellee dismissed on directed verdict at close of plaintiff’s case.
4. and 5. Dr. William Booth and Dr. Donald Cowick, surgeons who performed the gallbladder surgery; defendants voluntarily dismissed by plaintiffs during trial.
6. and 7. Dr. Martin Peuler and Anesthesiology Group Associates (formerly Bel-leau, McCord, Patin and Ostrowe, Inc.); ap-pellees dismissed on directed verdict after court’s ruling on jury instruction.
8. Mrs. Ann Ashbaugh, C.R.N.A., the certified registered nurse anesthetist, employed by Anesthesiology Group Associates, who intubated and anesthetized the patient; appellee dismissed on directed verdict after court’s ruling on jury instruction.
*93 9. Dr. Marshall Sommers, an anesthesiologist, employed by Anesthesiology Group Associates, who was present in the recovery room; defendant voluntarily dismissed by plaintiffs prior to trial.
Consequently, only Our Lady of the Lake Regional Medical Center, Dr. Peuler, Mrs. Ashbaugh, Anesthesiology Group Associates, Dr. Radzikowski and Dr. Osterberger are before us on appeal.
After a proper proceeding before a medical review panel, which ruled unanimously in favor of all of the defendants, appellants brought the present lawsuit.
A civil jury trial began on May 4, 1987. During their case in chief, the plaintiffs called members of Mr. Cangelosi’s family to testify as to the symptoms they observed. The plaintiffs also called two expert witnesses: Dr. Mouney and Dr. Joseph Stirt, an anesthesiologist from the University of Virginia Medical Center in Charlottesville, Virginia.
Dr. Mouney was the only physician called by plaintiffs who had examined Mr. Cange-losi. The doctor and the hospital records of his treatment of the patient list the tracha-el injury as a “traumatic” one. Dr. Mou-ney’s original opinion was that the injury occurred between the time that the tube was put in and the time that the tube was taken out. However, on cross examination the witness admitted that if he were to assume that the anesthetist was experienced, that no stylet was used, that there was no bleeding in the trachea, and that the intubation was atraumatic, it was “highly unlikely” and “almost inconceivable” that a fracture of the tracheal cartilages occurred at the time of intubation.
Dr. Stirt stated that in his opinion the word “trauma” as used in the ENT hospital records denoted an injury from external force, as opposed to an injury from an internal causation. Dr. Stirt concluded that he did not see how Mr. Cangelosi could have sustained this type of injury unless some health care provider deviated from the acceptable standard of care during the period of intubation. However, Dr. Stirt, when given the same facts as presented to Dr. Mouney in the form of a hypothetical question by defense counsel, conceded that he would conclude that the intubation is “probably not what caused the problem.”
When plaintiffs rested their case, all of the defendants made motions for a directed verdict. The trial judge granted a directed verdict in favor of Dr. Radzikowski on the ground that he did not see the patient at any time while he was intubated. He also directed a verdict in favor of Dr. Osterber-ger on the ground that, although he extu-bated the patient, the testimony of the plaintiffs’ experts established that the ex-tubation was not the cause of the injury. The motions of the remaining defendants were taken under advisement.
The case for the defense began. Prior to its completion, plaintiffs’ counsel announced that they had decided to withdraw opposition to the motions for directed verdict for Dr. Booth and Dr. Cowick; these defendants were voluntarily dismissed from the suit.
The trial proceeded with the remaining defendants (Dr. Peuler, Mrs. Ashbaugh, Anesthesiology Group Associates, and Our Lady of the Lake Regional Medical Center) presenting further evidence. Together the defendants called the following fact and expert witnesses: Dr. Radzikowski, Dr. Booth, Dr. Cowick, Mrs. Ashbaugh, Dr. Osterberger, Dr. Peuler, Ms. Cheryl Moore, and Dr. James LaNasa, Jr.
The thrust of the defendants’ case, which is well supported by the record, was that the process known as perichondritis, inflammation of the tissues surrounding the trachael cartilage, fully accounts for the injuries sustained by Mr. Cangelosi. Their experts explained that it is not possible to immobilize the endotracheal tube; it will move up and down with movements of the patient’s head and every time the patient swallows or coughs. The movement can abrade and denude the thin wall of the trachea and serve as a focus of inflammation. The restricted blood flow caused by the cuff of the tube impedes the ability of the tissue to repair itself. Tissue death of the tracheal membrane from pressure necrosis deprives the underlying cartilage, which is also avascular, of its entire blood *94 supply. Scar tissue forms and can contract concentrically on the weakened cartilage resulting in a loss of structural integrity of the trachea. Dr. LaNasa, the only otolar-yngologist called at the trial other than Dr. Mouney, was of the opinion that the process of perichondritis fully explained the condition of Mr. Cangelosi’s trachea found by Dr. Mouney.
The non-negligent theory of causation of the injury, coupled with witnesses who testified as to the “normal” procedures used in the care and treatment of Mr. Cangelosi during the time from his intubation until his extubation, completed the defendants’ case. When the defense rested, the plaintiffs declined to present any rebuttal.
After the close of all of the evidence, the trial judge announced his decision to deny the motions for directed verdict which he had taken under advisement and which remained extant. The trial judge specified that he had considered only the evidence introduced by plaintiffs, in a light most favorable to the plaintiffs. He found that reasonable minds could differ on the causation issue because of the testimony of Dr. Stirt.
Next, the trial court considered whether or not to charge the jury on the doctrine of res ipsa loquitur. Considering all of the evidence, he concluded that the evidence failed one of the three-pronged tests for the applicability of the doctrine, specifically: proof that the injury would not have occurred in the absence of negligence. Consequently, the trial judge announced that the doctrine of res ipsa loquitur was inapplicable to the facts of the case and that he would not charge the jury on the doctrine.
Additional motions for directed verdict were made on behalf of Dr. Peuler, Mrs. Ashbaugh, Anesthesiology Group Associates, and Our Lady of the Lake Regional Medical Center. Considering the timing of these motions, after the close of all of the evidence, the trial judge considered all of the evidence in making his ruling. In light of the fact that the plaintiffs had relied solely on res ipsa loquitur and had made no effort to establish that any of the defendants had committed a substandard act, the trial court granted these final motions of the remaining defendants.
RES IPSA LOQUITUR
Appellants assign as error the trial court’s refusal to charge the jury on res ipsa loquitur absent proof by a preponderance of the evidence of the existence of the elements of the doctrine.
First, we shall consider the propriety of the trial court’s making the determination and whether or not the decision not to instruct was correct. Finally, we shall consider the correctness of the result of the refusal to instruct, that is, the granting of the directed verdicts.
Since this is a medical malpractice action, the provisions of LSA-R.S. 9:2794 apply. Section C of the statute provides:
In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance'of the evidence, the negligence of the physician, dentist or chiropractic physician. The jury shall be further instructed that injury alone does not raise a presumption of the physician’s, dentist’s or chiropractic physician’s negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable.
We read the statute, as did the trial judge, as a legislative directive to the courts for jury instructions in medical malpractice cases. The doctrine of res ipsa loquitur is the antithesis of the directions given in the first two sentences of Section C about the burden of proof and lack of a presumption. Clearly the legislature added the final sentence, as an exception to the general directions of the preceding sentences.
In the instant case the trial judge correctly performed the function mandated by the statute. He decided the applicability of the doctrine of res ipsa loquitur by addressing the threshold question of whether the evidence showed the three requisite elements for applicability. See Rog *95 ers v. Brown, 416 So.2d 624 (La.App. 2d Cir.), writ denied, 422 So.2d 153 (La.1982). Those three elements are: (1) that the defendants had actual control of the agency, instrumentality or conditions which caused plaintiffs injuries; (2) that the evidence as to the true cause of the injury is more readily accessible to defendants than to plaintiff; and (3) that the accident was of a kind that does not occur in the absence of negligence. See Madere v. Ochsner Foundation Hospital, 505 So.2d 146 (La.App. 4th Cir.1987), citing Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2d Cir.1984).
In the reasons dictated into the record, the trial judge noted that the plaintiffs’ evidence that Mr. Cangelosi was anesthetized and/or heavily sedated throughout the entire period of intubation satisfied the first two elements. However, the trial judge concluded that the evidence failed on the final element: there was no proof that the injury to Mr. Cangelosi would not have occurred in the absence of negligence.
We agree with the trial judge’s conclusion. Although the plaintiffs’ theory of causation, that the injury occurred because of some trauma during the time of intubation or thereafter is plausible, the defendants’ theory of causation, perichondritis, is equally plausible. A plaintiff may not avail himself of the res ipsa loquitur doctrine if the hypothesis that the injury was not caused by the defendant’s negligence is as plausible as the postulate that the injury was caused by the negligence. See Morgan v. Willis-Knighton Medical Center, supra, citing Aetna Casualty & Surety Co. v. Rothman, 331 So.2d 81 (La.App. 1st Cir.1976).
Furthermore, even if the trial judge committed error in refusing to charge the jury on the doctrine of res ipsa loquitur, we hold that the defendants’ evidence effectively rebuts any inference that the negligence of any of the defendants was the cause of Mr. Cangelosi’s injury. We reach this conclusion after a thorough review of the record. See Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975).
Having found that the trial judge interpreted LSA-R.S. 9:2794(C) correctly and that he made a correct assessment of the evidence, we shall next consider whether or not the directed verdicts were appropriate.
In a case strikingly similar to the one sub judice, Madere v. Ochsner Foundation Hospital, supra, our brethem of the Fourth Circuit Court of Appeal affirmed the granting of directed verdicts. The plaintiff had sued for alleged vocal cord paralysis following surgery. The appellate court noted that the injury did not warrant an inference that the defendants were negligent, because the evidence completely failed to show that temporary paralysis of the vocal cords does not occur in the absence of negligence. Since res ipsa loqui-tur did not apply, the burden did not shift to the defendants to prove they were not negligent. The directed verdict for the defendants was proper.
Likewise, in the instant case, once the determination was made that res ipsa loquitur did not apply, the trial court would have been compelled to instruct the jury on the plaintiffs’ burden of proof pursuant to LSA-R.S. 9:2794. The record which we have examined is devoid of proof which would have satisfied this burden. Reasonable minds could not differ on the failure of the evidence, viewed in a light most favorable to the plaintiffs, to prove negligence on the part of any of the defendants herein. Cf. Bryan v. Varnado, 394 So.2d 1321 (La.App. 1st Cir.1981).
For the foregoing reasons, the judgment of the trial court is affirmed, and the plaintiffs are cast for costs of this appeal.
AFFIRMED.